William C. Baton
Alexander L. Callo
**SAUL EWING LLP**
One Riverfront Plaza
1037 Raymond Blvd., Suite 1520
Newark, NJ 07102
wbaton@saul.com

*Attorneys for Plaintiffs*
*Okra Holdings, Inc. and Goldfinger, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| OKRA HOLDINGS, INC. and GOLDFINGER, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> H. BETTI INDUSTRIES, INC. D/B/A BETSON IMPERIAL PARTS & SERVICE and RICHARD ZAYAS-BAZAN, <br><br> Defendants. | Civil Action No. _____ <br><br> **(Filed Electronically)** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, Okra Holdings, Inc. ("Okra") and Goldfinger, Inc. ("Goldfinger," together with Okra, "Plaintiffs"), complaining of Defendants H. Betti Industries, Inc. d/b/a Betson Imperial Parts & Service ("Betson") and Richard Zayas-Bazan ("Zayas-Bazan"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for (1) infringement of Plaintiffs' registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114;  (2) unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) trademark infringement in violation of New Jersey's Trademark Act, N.J.S.A. § 56:3-13.16; (5)

1

unfair competition in violation of the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1, *et. seq.*; (6)

trademark infringement in violation of the common law of the State of New Jersey; (7) breach of

contract; (8) defamation; (9) trade libel; (10) tortious interference with contracts; (11) tortious

interference with prospective economic benefit; (12) deceptive and fraudulent acts and practices

in connection with the advertisement and sale of merchandise in violation of the New Jersey

Consumer Fraud Act, N.J.S.A. § 56:8-2, *et. seq.*; (13) common law unfair competition; (14)

common law unjust enrichment; and (15) common law fraud.

2.      As described more fully below, and among other things, Betson has advertised,

promoted, sold, offered for sale, or otherwise contributed to the sale of products that infringe

Plaintiffs' trademarks and trade dress rights. Betson's conduct has caused consumer confusion

and irreparable injury to Plaintiffs and, unless enjoined, will continue to cause the likelihood of

consumer confusion and irreparable injury.

3.      Plaintiffs have spent substantial time, effort, and money advertising and

promoting their trademarks and as a result, they have developed significant goodwill, brand

recognition, and other intangible value.

4.      As a direct result of Betson's wrongful conduct (1) Plaintiffs' reputation and

goodwill have been irreparably injured, and will continue to be irreparably injured; (2)

Plaintiffs have lost, and are continuing to lose, substantial sales; (3) the purchasing public and

consumers have been, and continue to be, deceived because Betson is passing off Goldfinger

products as Betson's own; and (4) the purchasing public and consumers are being deceived to

believe that Plaintiffs authorize, endorse, or sponsor Betson's use of their intellectual property or

that there is a relationship or affiliation between Plaintiffs and Betson when none exists.

5.      This action seeks temporary and permanent injunctive relief and damages for

Betson's infringement of Plaintiffs' intellectual property rights and breaches of contract and Defendants' misconduct and tortious acts.

## THE PARTIES

6.     Plaintiff Okra is a corporation organized and operating under the laws of the State of South Carolina, with its principal place of business at 3547 Meeks Farm Road, Suite B, Johns Island, South Carolina 29457.

7.     Plaintiff Goldfinger is a corporation organized and operating under the laws of the State of South Carolina, with its principal place of business at 3547 Meeks Farm Road, Suite B, Johns Island, South Carolina 29457.

8.     Defendant Betson is a corporation incorporated and existing under the laws of the State of New Jersey, with its principal place of business at 303 Paterson Plank Road, Carlstadt, New Jersey 07072.

9.     Defendant Zayas-Bazan is an individual who resides in and is a citizen of the State of New Jersey. Zayas-Bazan is the President of Betson.[1]

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), (b), and this Court has supplemental jurisdiction over the common law and state law claims asserted herein because they are so related to the claims in this action that arise under federal law as to constitute part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

11.     This Court has jurisdiction over the subject matter of the claims asserted in this action against Zayas-Bazan pursuant to 28 U.S.C. § 1332 because the parties are citizens of

---

[1] Defendant Zayas-Bazan is a private individual, and despite Plaintiff's diligent efforts, his residential address could not be located.

different states, namely, South Carolina and New Jersey, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Betson because it is incorporated in New Jersey and has committed tortious acts in this Judicial District that give rise to Plaintiffs' claims and/or Plaintiffs' claims relate to and arise out of Betson's contacts with New Jersey.

13. This Court has personal jurisdiction over Zayas-Bayan because he is a citizen of New Jersey and has committed tortious acts in this Judicial District that give rise to Plaintiffs' fraud and unfair competition claims and/or Plaintiffs' fraud and unfair competition claims relate to and arise out of Zayas-Bazan's contacts with New Jersey.

14. Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b)(1) and (2), respectively, because Defendants reside in this Judicial District and a substantial part of the events or omissions giving rise to the claims herein occurred in this Judicial District.

## **FACTS**

### I. **Background On Plaintiffs' Business, Growth, and Success**

15. In 2010, Daniel Hartmann ("Mr. Hartmann") – an inventor and entrepreneur with a strong background in consumer electronics – made a decision to form a business centered on manufacturing computer monitors and related equipment for the gaming and amusement industry ("gaming industry"),[2] and formed what is now Goldfinger, Inc.

16. Okra Holdings, Inc.'s stock is 100% owned by Mr. Hartmann, and Okra Holdings, Inc. owns 100% of Goldfinger, Inc.' stock. Goldfinger uses the Plaintiffs' Trademarks (defined

---

[2]  The gaming industry includes businesses that operate video game arcades and game-focused family entertainment. Industry operators typically rent and/or purchase arcade games that customers play for a fee, typically in public venues such as game parlors, amusement arcades, and convenience stores. Another segment of the industry focuses on legal gambling and games found in casinos (*e.g.*, slot machines).

below), and advertises, sells, and offers Goldfinger products for sale as a licensee of Okra.

17.    For the first few years, Goldfinger's business focused on manufacturing and supplying circuit boards to its customers in the gaming industry – some of these customers are still customers of Goldfinger today, over fourteen years later. During this time, Goldfinger learned that customers were very satisfied with the quality and price point of circuit boards sold by Goldfinger under its brand.

18.    Also during this time period, certain of Goldfinger's customers began expressing frustrations concerning the state of the then-current market for commercial grade monitors, often stating that monitors sold by foreign companies lacked quality controls, and those sold by companies in the United States were too expensive. As a result of this market dissatisfaction, and at the urging of various customers, Mr. Hartmann recognized an opportunity for Goldfinger to capitalize on its experience and track record in building high-quality / reasonably priced circuit boards, and fill this market need for a better, more affordable, commercial grade monitor.

19.    Shortly thereafter, working from a small manufacturing location in South Carolina, Goldfinger introduced its first product line of monitors in 2012. The initial product line included approximately eight "parts" (*i.e.*, eight monitor variations based on screen size / capabilities), including three (3) 19-inch monitors, four (4) 22-inch monitors, and one (1) 24-inch monitor.

20.    Goldfinger's first product line was aimed at customers owning and operating games in Texas, North Carolina, and Tennessee, and revolved around touch screen monitors and related accessories.

21.    In the years after its formation, the Goldfinger business grew, with Goldfinger typically introducing between five and ten new monitors each year. The new monitors differed in

size and/or frame design.[3] For example, just one year after the initial release of monitors, Goldfinger released 32-inch and 42-inch monitors in 2013.

22.    At the request of Goldfinger's customers and to meet their needs, Goldfinger developed and offered for sale a variety of new products, including 10-, 12-, 15-, 15.6-, 17-, 19-, 22-, 23-, 24-, 27-, 28-, 43-, 49-, 55-, 65-, and 75-inch monitors in subsequent years under its growing brand.

23.    Over time, Goldfinger developed a national customer base, mainly consisting of large and small businesses in the gaming industry.

24.    Many of Goldfinger's customers are owners and operators of games for end-user consumers. These customers purchase Goldfinger products, such as monitors, for inclusion in what is known as an arcade cabinet, which is a combination of parts and accessories displaying and allowing consumers to play the customer's games.

25.    Much like any successful business, Goldfinger's sales and operations have expanded over the years and experienced steady revenue growth. In 2012, Goldfinger's first year of manufacturing and selling monitors, Goldfinger's annual revenue was approximately $1.2 million. Goldfinger's revenue increased to $2 million in 2013. By 2017, Goldfinger's annual revenues had increased to some $12 million, and Goldfinger's revenue continued to increase significantly, to approximately $45 million in 2021.

26.    Goldfinger's  growing sales were driven by a customer base that expanded dramatically, both in terms of demand for sales and geographically. Managing the technological demands of a market that required constant product innovation, plus the marketing and logistical requirements of servicing an expanding and highly competitive market, brought Goldfinger to

---

[3]  Variations of monitor frames are designed to fit different game cabinets.

the next stage of its evolution.

27.    Plaintiffs have used a variety of legally protected trademarks, federally registered and common law trademarks, including trade dress rights, for many years on and in connection with the advertisement and sale of Goldfinger-branded monitors and related products (the "Plaintiffs' Trademarks"). Specifically, the Plaintiffs' Trademarks include the federally registered and common law trademarks and trade dress rights alleged below.

28.    Okra controls the nature and quality of the goods and services on or in connection with which the Plaintiffs' Trademarks and relating to the Goldfinger brand are used.

29.    Okra exercises extensive and continuous control over the nature and quality of all goods manufactured under the Goldfinger brand and that use the Plaintiffs' Trademarks, including those produced by Goldfinger VN Co., Ltd. ("Goldfinger Vietnam"). Okra maintains a contractual manufacturing arrangement with Goldfinger Vietnam, under which Okra provides the production samples, technical data sheets, and detailed specifications that govern every order. Goldfinger Vietnam may not begin mass production until Okra confirms and accepts the samples. Throughout production, Okra's representatives monitor product quality through required videos, photographs, and inspection checkpoints, and Okra retains final approval authority before any shipment is released. The contract expressly states that once Okra approves the goods, Goldfinger Vietnam bears no responsibility for post-shipment complaints, underscoring that quality control is exclusively directed and enforced by Okra.

30.    Okra's control does not end at the point of manufacture. Once the finished goods are shipped from Vietnam to Okra's facility in South Carolina, Okra conducts an additional quality-control inspection to ensure that all products meet Okra's internal standards before they enter the U.S. market and are offered for sale by Goldfinger. These layered inspections—first in

Vietnam and then again in South Carolina—demonstrate Okra's ongoing authority over the quality and character of all goods associated with the Plaintiffs' Trademarks and their use by Goldfinger.

31. All inspections in Vietnam occur under systems designed by Okra to meet the quality standards required for Goldfinger-branded products. While the market average failure or warranty rate for similar products is approximately 5%, Goldfinger-branded goods achieve an exceptionally low customer return rate of 0.1%, a result attributable to Okra's stringent quality requirements and oversight. Goldfinger is required to adhere to Okra's quality standards in all uses of the Plaintiffs' Trademarks, and all product documentation is maintained by Okra.

32. Okra and Goldfinger operate within the same facility, enabling Okra to directly supervise Goldfinger's use of the Plaintiffs' Trademarks and to ensure that all Goldfinger-branded goods and services conform to Okra's standards. Mr. Hartmann, acting on behalf of both Okra and Goldfinger, oversees Goldfinger's use of the Plaintiffs' Trademarks and has personally designed the testing protocols, inspection processes, and packaging requirements used for Goldfinger-branded products. When issues arise—whether related to monitor performance, quality concerns, or customer-use problems—Goldfinger must work directly with the Vietnam facility to resolve them under Okra's established procedures. Okra also retains the right to audit Goldfinger Vietnam every two months, further demonstrating its ongoing authority over the quality and character of all goods associated with the Goldfinger brand and the Plaintiffs' Trademarks.

33. Okra's control extends beyond manufacturing and inspection to the downstream sale and marketing of Goldfinger-branded products. Once the goods are in the hands of Goldfinger, Okra ensures that Goldfinger sells and markets products that use the Plaintiffs'

8

Trademarks in compliance with Okra's internal quality standards. This oversight ensures that the consumer-facing presentation of the Goldfinger brand remains aligned with Okra's requirements and that all uses of the Plaintiffs' Trademarks reflect the quality and reputation that customers have come to associate with Goldfinger monitors and accessories.

## II.    The Infringed Registered Trademarks

34.    Plaintiff Okra owns federally registered trademarks, specifically (1) U.S. Reg. No. 4,892,437, issued by the United States Patent & Trademark Office ("PTO") on January 26, 2016, for the "Goldfinger" trademark;[4] (2) U.S. Reg. No. 6,905,935, issued by the PTO on November 22, 2022, for the "Goldfinger" trademark in a stylized lettering with the "O" appearing as a fingerprint; (3) U.S. Reg. No. 6,905,940, issued by the PTO on November 22, 2022, which consists of the stylized letters of the word "GOLD" stacked on top of the word "FINGER," also in stylized lettering, and bearing a fingerprint that appears to the right of the stacked words; and (4) U.S. Reg. No. 6,906,841, issued by the PTO on November 22, 2022, which consists of a drawing of a fingerprint (collectively, the "Registered Trademarks"). Copies of the Registered Trademarks' registration certificates are attached as Exhibit 1.

35.    Below is a table showing the Registered Trademarks.

| USPTO Registration No. | Trademark |
|---|---|
| 4,892,437 | GOLDFINGER |
| 6,905,935 | G⊙LDFINGER |
| 6,905,940 | GOLD FINGER |

---

[4] On June 13, 2017, Okra LLC assigned its right, title, and interest in U.S. Reg. No. 4,892,437 to Plaintiff Okra Holdings, Inc.

| 6,906,841 | |
|---|---|

36.    Plaintiffs used the Registered Trademarks extensively and continuously before Betson began using them in commerce without Plaintiffs' authorization.

37.    Betson has used the Registered Trademarks to advertise, offer for sale, and sell Goldfinger products without authorization and improperly trade on Plaintiffs' goodwill, which has confused consumers to believe that Plaintiffs sponsor or endorse Betson's use of the Registered Trademarks or that there is currently a business relationship between Plaintiffs and Betson when no such sponsorship, endorsement, or relationship exists.

38.    The registrations for the Registered Trademarks are in full force and effect and are therefore valid and enforceable.

39.    The registrations for the Registered Trademarks are *prima facie* evidence of their validity and conclusive evidence of Plaintiffs' exclusive rights to use the Registered Trademarks in commerce in connection with their products.

40.    The registrations for the Registered Trademarks provide sufficient notice to Betson of Plaintiffs' ownership and exclusive rights to them.

41.    The Registered Trademarks, and the goodwill of Plaintiffs' business in connection with which the Registered Trademarks are used, have been continuously used by Plaintiffs and have never been abandoned.

42.    Plaintiffs intend to continue to preserve and maintain their rights with respect to the Registered Trademarks, and to make use of the Registered Trademarks in connection with all aspects of their business.

43.     Plaintiffs have expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the Registered Trademarks. As a result, products bearing the Registered Trademarks are widely recognized and exclusively associated by gaming industry professionals and other consumers as being high-quality products manufactured and distributed by Plaintiffs through authorized distribution channels.

### III.     Plaintiffs' Common Law Trademark and Trade Dress Rights

44.     Plaintiffs own protectable common law trademark rights, including trade dress rights for the distinctive "look and feel" of Goldfinger monitors and remote controls, separate and distinct from the functional elements of these items.

45.     Plaintiffs' common law trademark and trade dress rights serve to identify Plaintiffs as the source of high-quality monitors and accessories made for the gaming industry. Plaintiffs have invested substantial time, effort, and financial resources developing and promoting their common law trademark and trade dress rights in connection with the promotion and delivery of Goldfinger products and services. Plaintiffs' common law trademark and trade dress rights are an asset of substantial value as the public face of Plaintiffs and as a symbol of Plaintiffs' quality products and services and their goodwill. Plaintiffs' common law trademarks and trade dress are inherently distinctive as applied to Goldfinger products and services. Alternatively, Plaintiffs' common law trademarks and trade dress have acquired secondary meaning through Plaintiffs' long-term, widespread, and continuous use of them in commerce.

46.     First, Goldfinger-branded monitors incorporate a trade dress comprising a distinct "look and feel" of elements. This trade dress includes (1) four symmetric sets of two white arrows (*i.e.*, eight white arrows in total) on the back cover of the monitor that point to threaded mounting holes in which each set of white arrows is interrupted by white font; (2) four elongated stiffening ribs on the back cover of the monitor; (3) a rotatable back cover in the center of the

11

monitor and within two sets of white arrows that are angled in a particular fashion; and (4) screen printed writing in a distinctive white font.

47. Plaintiffs first used the trade dress for the back of Goldfinger monitors in commerce in September 2021 and have used this trade dress continuously in commerce since that time.

48. These elements are applied in combination on Goldfinger monitors to create Plaintiffs' trade dress. The Goldfinger monitor incorporates a distinctive visual design, graphic treatment, and familiar appearance that has become readily identifiable by the consuming public as originating from Plaintiffs.

49. Second, Goldfinger-branded remote controls incorporate a trade dress comprising a distinct "look and feel" of elements. This trade dress includes (1) gold font and lettering; (2) the use of the Goldfinger trademark toward the top of the remote control; (3) an angled design that descends from the top of the remote control to where the remote control's light is placed; (4) five buttons relating to the operation of the remote control identified by gold font lettering in the following order: "Power," "Back," "Left," "Right," and "Menu"; and (5) the remote control's casing is comprised of grey plastic.

50. Plaintiffs first used the trade dress for the back of Goldfinger remote controls in commerce in September 2021 and have used this trade dress continuously in commerce since that time.

51. These elements are applied in combination on Goldfinger remote controls to create Plaintiffs' trade dress. The Goldfinger remote control incorporates a distinctive visual design, graphic treatment, and familiar appearance that has become readily identifiable by the consuming public as originating from Plaintiffs.

12

IV.    **Betson Went from Okra's Exclusive Distributor to its Competitor**

52.    On January 1, 2018, Plaintiff Okra and Betson entered into a Distributor Agreement under which Okra granted Betson the exclusive right to sell and distribute Goldfinger products worldwide (the "2018 Agreement").

53.    Under the 2018 Agreement, Betson agreed, among other things, to grow and protect the Goldfinger business and brand name.

54.    Under the 2018 Agreement, Betson agreed to "(a) safeguard and promote the reputations of [Goldfinger] and Brand products, (b) refrain from any conduct which might be harmful to such reputations or the marketing of [Goldfinger's] Products and (c) avoid all illegal, unfair, deceptive, misleading or unethical practices."

55.    After Okra determined that Betson had not performed its obligations under the 2018 Agreement, and in fact had no intention of doing so, Okra exercised its legal right to terminate the 2018 Agreement.

56.    On July 27, 2023, Okra terminated the 2018 Agreement effective October 25, 2023, in accordance with its rights under the 2018 Agreement and the applicable law.

57.    After the 2018 Agreement was terminated, Betson began making claims in the marketplace about Goldfinger that were untrue, disparaging, and designed to cause consumer confusion. Betson did this in a concerted and planned fashion through its salesforce, who disseminated these statements to Goldfinger's customers and business prospects. Betson did this, initially, to trade on Goldfinger's goodwill and drive sales when it benefitted Betson, but then changed the nature of the false statements once it no longer suited Betson's interests, after Betson had launched its competing brand of monitors that infringe Plaintiffs' trade dress.

58.    In early 2024, just a few months after the 2018 Agreement terminated, Goldfinger personnel began receiving reports from consumers that Betson salespeople were telling them that

13

"Betson owns Goldfinger" and that Betson had decided to phase out the Goldfinger brand and, in sum or substance, that Goldfinger monitors were going away.

59. Betson's salesforce made these statements to confuse and mislead consumers into believing that a relationship existed between Goldfinger and Betson, and that Betson was the source of Goldfinger-branded products, despite the fact that Betson was no longer an authorized Goldfinger distributor.

60. Actual confusion exists because customers and potential customers of Goldfinger products told Goldfinger personnel that Betson's misrepresentations caused them to believe that Betson owns Goldfinger. Thus, Betson's actions caused actual confusion among consumers as to the true owner of the Plaintiffs' Trademarks, the source of Goldfinger products, that Plaintiffs sponsor, approve of, or endorse Betson's use of the Plaintiffs' Trademarks, and that there is some kind of corporate affiliation or relationship between Goldfinger and Betson.

61. On March 15, 2024, Betson commenced a lawsuit against Okra in the United States District Court for the District of New Jersey, under Case No. 24-cv-03168 (the "Lawsuit").

62. On August 2, 2024, Betson filed an application with the U.S. Patent & Trademark Office to register the trademark for "Javelin Displays" in Class 9, in connection with the sale of touchscreen monitors.

63. In a news release dated September 27, 2024, a company named Pixel Works Ind. ("Pixel") announced that it had entered into a "strategic partnership" with Betson under which Betson became Pixel's exclusive distributor of for monitors, button decks, touch screens, and related items for the gaming industry across the United States.[5]

---

[5] *See* https://pixelworksind.com/about/news/2534.html.

14

64. The September 27, 2024 news release goes on to state that "[a]s part of this collaboration, Pixel Works will also introduce an exclusive line of premium monitors under Betson's Imperial's **Javelin Displays™** brand, designed specifically to meet the needs of the gaming industry."

65. After Betson launched its competing Javelin Displays brand, Betson's salesforce modified the false statements they were making about Goldfinger. Whereas Betson had previously sought to mislead consumers to believe that Betson owned Goldfinger, around this time Goldfinger personnel began receiving reports from consumers that Betson personnel were also falsely telling them Goldfinger was going out of business, that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were not going to be made anymore, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors.

66. Betson's false statements about Goldfinger and other misconduct has damaged Goldfinger, including lost customers and lost sales to the following actual and potential customers: Cardinal State Distributing; Casino Platino; Cataput (AIE Manufacturing); Coin Op Solutions; Diamond Game Enterprises, Inc.; Epic Tech LLC; Great Lakes Amusement LLC; Ivey Promotions LLC; Kiosk Innovations; LW Vending Ltd.; Primero Games LLC; Quixant; Radical Gaming Solutions; Southern Amusements; Stansfield Vending, Inc.; Toccata Gaming International; Ultra Group of Companies; United Gaming LLC; and, VSR Industries Inc.

67. In addition, Goldfinger generates revenue from servicing and repairing monitors that are out of warranty. Many customers have not sent monitors to Goldfinger for repairs because Betson has falsely told them that Goldinger is going out of business and that Goldfinger is unable to repair monitors. As a result of Betson's false statements, Plaintiffs' have lost over $200,000 in sales that would have been generated from the servicing and repair of out-of-

15

warranty monitors.

68.    Nevertheless, Betson continues to use the Plaintiffs' Trademarks prominently on its website and in advertising to this day so that it can continue to lure customers by trading on Plaintiffs' goodwill and reputation, and the high-quality associated with the Goldfinger brand, while on the other hand, making false and disparaging statements about Goldfinger to unfairly compete and promote its Javelin Displays monitors at Plaintiffs' expense.

69.    On January 22, 2026, the district court entered a Stipulation of Dismissal with Prejudice that dismissed the Lawsuit.

70.    On February 17, 2026, the PTO issued Reg. No. 8,146,969 to Betson for the Javelin Displays trademark. The registration certificate states that Betson first used the Javelin Displays trademark in August, 2024.

71.    Betson's Javelin Displays products compete directly and commercially with Plaintiffs' Goldfinger products because they vie for the same gaming industry consumers.

72.    In conjunction with the dismissal of the Lawsuit, Plaintiffs and Betson entered into a Confidential Settlement Agreement and Mutual Release (the "Settlement Agreement").

73.    Under the Settlement Agreement, Betson is prohibited from (1) making false statements of fact about Plaintiffs; (2) making statements that are calculated to, or would reasonably be expected to, disparage Plaintiffs, Plaintiffs' products, business practices, financial status, or reputation; and (3) any campaign or program involving the making of false, misleading, or disparaging communications about Plaintiffs' products, business, business practices, financial status, or reputation in the marketplace.

74.    Under the Settlement Agreement, Betson was obligated to (1) ship, in addition to other items, two monitors: (a) one 32" Javelin Displays monitor with front-facing LED light ring,

16

which Betson offers for sale as part number F32F2AP01; and (b) one 43" Javelin Displays monitor with front-facing LED light ring, which Betson offers for sale as part number F43F2AP01 and one multi-channel LED controller (together, the "Samples") to Goldfinger; and (2) "verify and affirm that the Samples are production models reflective of the models that are currently offered in the marketplace."

75.    Below are images of a 32" Javelin Displays monitor and a 43" Javelin Displays monitor as shown on the Javelin Displays website. The images show that Betson offers these models in the marketplace with a back that is all black, including the back cover.[6]



---

[6] Although the part numbers for the Samples in the Settlement Agreement do not match precisely with the part numbers of the monitors shown in the images below, Betson's website does not appear to (1) offer the monitors for sale under the part numbers identified in the Settlement Agreement; or (2) depict monitors that have a back cover that is not black.

17





## V.    Betson's Infringing Activities

### a.    Betson Uses the Plaintiffs' Trademarks On Its Website to Intentionally Create Consumer Confusion

76.    Betson conspicuously and extensively has used and continues to use the Plaintiffs' Trademarks on its website and in interstate commerce to intentionally deceive consumers into believing that Betson is the source or an authorized distributor of Goldfinger products and that Plaintiffs consent to Betson's use of the Plaintiffs' Trademarks. Betson used the Plaintiffs' Trademarks on no less than 50 occasions on its website and in various contexts to mislead consumers about the true source of Goldfinger products.

77.    In or about March 2025, Plaintiffs received reports that Betson was telling prospective customers that it had exhausted its inventory of Goldfinger products that it maintained after the termination of the 2018 Agreement. Alternatively, if Betson has an inventory

of Goldfinger products that it continues to sell, those products are materially different from genuine Goldfinger-branded products. In any event, the effect is the same – Betson continues to use the Plaintiffs' Trademarks to this day, without authorization, to confuse and deceive customers and improperly trade on Plaintiffs' goodwill.

78.    Below are exemplar screenshots of Betson's website showing its improper use of the Plaintiffs' Trademarks. Betson makes other infringing uses of the Plaintiffs' Trademarks on its website, not shown below.









79.    Betson's improper use of the Plaintiffs' Trademarks is designed and likely to cause consumer confusion because Betson assigns its own Betson-affiliated SKU# to each Goldfinger product that Betson advertises and offers for sale on its website. For example, in the image directly above, Betson has assigned the Goldfinger GF32H22N11-VB Monitor the Betson-affiliated SKU# "BET_205070." Betson's assignment of a Betson-affiliated SKU# to a Goldfinger product is likely to confuse consumers into believing that Betson is affiliated with Plaintiffs or that Plaintiffs approve, endorse, or sponsor Betson's use of the Plaintiffs' Trademarks.

80.    Betson's unauthorized and misleading use of the Plaintiffs' Trademarks is designed and likely to cause further consumer confusion and erode the substantial goodwill associated with the Goldfinger brand, because Betson uses the Plaintiffs' Trademarks to sell products that are not genuine Goldfinger goods. Betson confuses consumers into believing they are purchasing authentic Goldfinger products backed by Goldfinger's industry-leading warranty

22

and post-sale support. Consumers seeking the quality assurances and long-term protection associated with genuine Goldfinger products are instead provided only with Betson's narrow and materially inferior warranty coverage, resulting in confusion, disappointment, and harm to Goldfinger's reputation as a reliable company.

81.     Plaintiffs manufacture and sell high-quality display monitors and related components under the well-known Goldfinger brand. Monitors sold by Goldfinger come with a three-year limited warranty that covers defects in materials and workmanship under normal use. Under this warranty, Goldfinger provides customers with repair or replacement at no additional charge, supported by Goldfinger's U.S.-based technical team and established procedures. Goldfinger's warranty is a core component of the value and reliability associated with its brand, and Goldfinger consistently markets its products as backed by long-term, comprehensive post-sale support.

82.     By contrast, Betson sells products bearing the Plaintiffs' Trademarks but does not provide the warranty and service protection that accompanies Goldfinger's genuine goods. Instead, Betson offers a more restrictive warranty. In particular, Betson's warranty is limited to 90 days or one year for the competing Raw Thrills products it sells, but only 60 days for all other new items (*i.e.*, Goldfinger monitors), and Betson's warranty is voided by undefined "improper servicing."

83.     In addition, Betson's warranty imposes significant burdens on consumers, including customer-paid freight for all warranty claims, service charges, and strict claim deadlines, none of which apply to Goldfinger's warranty. Betson also imposes a 30% restocking fee on returns and requires customers to submit claims within 10 days of receipt, after which customers have no ability to return products. Betson requires customers to return defective parts

23

at their own expense and reserves the right to deny coverage if serial numbers are missing or if the product shows signs of wear that are inconsistent with Betson's unspecified standards. Thus, Betson's warranty provides consumers with significantly less protection, shorter coverage periods, and costs not associated with Goldfinger's warranty.

84.    Also, Betson will repair Goldfinger products that it sells to consumers. However, repairs made by Betson voids Goldfinger's warranty.

85.    These differences in warranty terms are material to consumers' purchasing decisions and directly affect the perceived quality and value of the products and their associated goodwill. Consumers purchasing products from Betson bearing the Plaintiffs' Trademarks are deceived by Betson to believe they are receiving goods backed by Goldfinger's robust three-year warranty and service infrastructure. In reality, they receive goods subject to dramatically inferior warranty protection, diminished service rights, and increased financial burdens. As a result, Betson's products are materially different from Goldfinger's genuine goods and are likely to cause consumer confusion regarding the authenticity, quality, and post-sale support associated with the Goldfinger brand.

86.    Moreover, Betson intentionally designed its website to confuse consumers into believing that an affiliation or relationship exists between Plaintiffs and Betson. Below is a screenshot of Betson's "careers" webpage that misleadingly offers consumers employment opportunities under the guise of "Goldfinger careers."

87.    Adding to the confusion that this misconduct will cause among consumers and in the marketplace, Betson invites consumers to "Visit our LinkedIn page for more information," and in so doing, provides a link to Goldfinger's LinkedIn page.

24



88.    In addition, Betson makes infringing uses of the Plaintiffs' Trademarks to improperly trade on the goodwill of the Goldfinger brand by advertising Goldfinger products and in certain instances redirecting consumers to Betson-affiliated products because the Goldfinger product is no longer available for sale by Betson. Below is a screenshot of Betson's website showing this. Specifically, Betson's webpage advises consumers that the Goldfinger GF43H24W12 43-inch monitor is not available and to "Please Order Replacement Part # BET_205226."

25



89.    A search of "BET_205226" on Betson's website leads a consumer to an advertisement for a "Raw Thrills 43" LCD Monitor," as shown in the screenshot below. Raw Thrills products are not manufactured, sold, or distributed by Plaintiffs, and the Raw Thrills brand and products compete with and are not affiliated with or sponsored or endorsed by Plaintiffs. Yet, Betson advertises and offers Raw Thrills products for sale as a comparable alternative to a Goldfinger product, and Plaintiffs cannot make any guarantees or representations about the quality or suitability of Raw Thrills products. Thus, Betson is improperly trading on Plaintiffs' goodwill to generate revenue through a bait and switch that directs consumers to purchase products that are unaffiliated and compete with Goldfinger products.

26



90.    Similarly, Betson's website describes Goldfinger products as "Discontinued" to mislead consumers that Betson – and not Plaintiffs – has stopped manufacturing them. This is especially in the context of Betson's other statements concerning Goldfinger products and their improper use of the Plaintiffs' Trademarks on the Betson website.



91.    If Betson does not have Goldfinger products in stock because they have been

27

discontinued or are no longer available, then Betson has no legitimate reason to include them in its website advertising. It can be surmised that the only reason Betson maintains website advertising with unavailable Goldfinger products is to lure consumers by trading on Plaintiffs' goodwill and reputation.

**b.   Betson's Infringement of Plaintiffs' Common Law Trademark and Trade Dress Rights**

92.    In March 2025, Plaintiffs inspected a Javelin Displays 43" monitor. Plaintiffs' inspection revealed that, not only did Betson copy numerous aspects of Plaintiffs' trade dress and product design features, but that there were actual Goldfinger components, with Goldfinger part numbers, inside the monitor. Upon information and belief, Betson sent Goldfinger monitors to Pixel for modification and to copy a Goldfinger-branded monitor. Among the features that Betson copied are: (1) the Goldfinger monitors' rotating back cover (Goldfinger is the only company with this feature); (2) the font used on Goldfinger monitors (there are numerous fonts available); (3) the printed description (a Javelin Displays monitor's frame erroneously claims to use Goldfinger's depth of 6 mm when the holes in a Javelin Displays monitor are actually 8-12 mm in depth); and (4) a 24V-12V power adapter board with the same design as the Goldfinger monitors. No monitor has ever used a 24V-12V power adapter board except for Goldfinger monitors, until Betson copied that design from Plaintiffs.

93.    Indeed, Plaintiffs strive to make Goldfinger monitors look different from competing products to prevent any confusion in the industry. Below are images of a Goldfinger monitor next to monitors sold by other competitors which illustrate the visual differences between a Goldfinger monitor and those sold by competitors other than Betson.

28





29



94.    By contrast, Betson has intentionally made its monitors look as similar as they can to Plaintiffs' monitors to confuse customers. Betson's monitors and remote controls mimic the "look and feel" of the Goldfinger monitors and remote controls, utilizing strikingly and confusingly similar layouts and design elements, including the appearance of the items and the arrangement of elements on the back cover of monitors and remote controls, the use and appearance of arrows and related verbiage, the use of colors, and the overall mood, style, and impression of the items.

95.    As depicted in the photograph below, a side-by-side comparison of the Goldfinger monitor (right) and Betson's monitor (left) (the "Infringing Monitor") shows that the Infringing Monitor copies several visual design features in order to confuse and mislead consumers into believing that the Infringing Monitor is a Goldfinger monitor.



96.     Examples of the confusingly similar visual features include, without limitation: (1) symmetric sets of white arrows interrupted by white font that point to threaded mounting holes in which two of the sets of arrows are angled identically with the arrows on the Goldfinger monitor; (2) four elongated stiffening ribs on the back cover of the monitor; (3) a rotatable back cover in the center of the monitor and within two sets of white arrows that are angled in the same fashion as the Goldfinger monitor; and (4) screen printed writing that uses the identical font and exact verbiage found on the Goldfinger monitor.

97.     Importantly, Plaintiffs analyzed Betson's listed "MAX SCREW DEPTH 6 mm" on the Infringing Monitor and have determined that it is not correct. Rather, the correct depth on the Infringing Monitor is 11 mm. This erroneous specification demonstrates that Betson copied this design feature from the Goldfinger monitor.

98.     Upon information and belief, Betson displayed the Infringing Monitor (or a similar variation) at trade shows (for example, in Betson's booth #1712 at a Las Vegas trade show in mid-March 2025), during which Betson promoted the Infringing Monitor under a new

31

brand named, "Javelin Displays."

99.     Upon information and belief, Betson has advertised and offered the Infringing Monitor (or a similar variation) for sale in trade literature and other advertising – *e.g.*, the 2024 Javelin Product Catalog and a website launched sometime during 2024 with the domain name https://javelindisplays.com.

100.     Next, the side-by-side comparison below of the Goldfinger remote control (top) and Betson's remote control (bottom) (the "Infringing Remote Control") shows that the Infringing Remote Control copies several visual design features in order to confuse and mislead consumers into believing that the Infringing Remote Control is a Goldfinger product, that there is some affiliation or relationship between Plaintiffs and Betson, or that Plaintiffs sponsor, endorse, or approve of Betson's use of Plaintiffs' trade dress rights.



### c. Betson's Infringement is Willful

101.     Betson is aware of the high regard that consumers in the gaming industry place on Goldfinger products, which is why Betson purposefully targeted Plaintiffs in its infringing activities, unfairly competitive acts, and other misconduct.

102. Betson has no license, authority or other permission from Plaintiffs to use any of the Plaintiffs' Trademarks in commerce in connection with the manufacturing, advertising, promoting, distributing, selling, and/or offering for sale of products.

103. Betson has been advised previously and repeatedly by Plaintiffs that its conduct is illegal and has been requested to cease and desist. First, counsel for Plaintiffs sent Betson's counsel a letter on March 27, 2025 demanding that Betson cease and desist its continuing and unauthorized use of the Plaintiffs' Trademarks. A true and accurate copy of the March 27, 2025 cease and desist letter is attached as Exhibit 2.

104. Second, Koppa Brand Protection sent a cease and desist letter on Okra's behalf to Betson on February 17, 2026. A true and accurate copy of the February 17, 2026 cease and desist letter from Koppa Brand Protection to Betson is attached as Exhibit 3.

105. Betson has ignored Plaintiffs' demands to cease and desist and continues its infringing activity. In addition to continuing to use the Plaintiffs' Trademarks on its website, Betson, in March 2026, sent an email advertisement, presumably blasted to its mailing list, that uses the Plaintiffs' Trademarks and contains false and misleading information.





106. The above advertisement is false because the Goldfinger products that Betson purportedly offers for sale were not "manufactured within the past two years." Plaintiffs have not sold Betson any Goldfinger products within the last two years, and thus, any inventory of Goldfinger products that Betson may have were manufactured more than two years ago.

107. Betson has engaged in the infringing activities knowingly, willfully, and intentionally, or with reckless disregard or willful blindness to Plaintiffs' rights, or with bad faith, for the purpose of trading on Plaintiffs' goodwill and reputation and the goodwill and reputation of the Plaintiffs' Trademarks.

108. Betson's activities are likely to create confusion and deceive consumers into believing that there is a connection or association between their infringing products and Plaintiffs' and Plaintiffs' products.

109. Absent injunctive relief, Betson is almost certain to continue to manufacture, advertise, promote, import, export, distribute, sell and/or offer for sale infringing products unless otherwise restrained, particularly given that Betson has been previously made aware of its infringing activity, was requested to stop, and refused to do so.

110. As a result of Betson's infringing activities, Plaintiffs are suffering a loss of the goodwill and reputation they have created in the Plaintiffs' Trademarks, which has also caused Plaintiffs to lose profits.

## VI.    Defendants Attempted to Conceal Betson's Infringement

111. On March 2, 2026, and pursuant to the Settlement Agreement, Goldfinger received the Samples shipped by Betson.

112. In connection with the Samples, Betson provided a Verification signed by its President, Richard Zayas-Bazan, which is dated February 12, 2026 (the "Verification"). In the Verification, Zayas-Bazan "verifies and affirms under oath and penalty of perjury that the

35

Samples included in Betson's Shipment are production models reflective of the models that are currently offered in the marketplace."

113.    Contrary to Zayas-Bazan's representations in the Verification, the Samples Betson shipped to Goldfinger are not "production models reflective of the models" that Betson currently offers in the marketplace under the Javelin Displays brand.

114.    Specifically, Betson modified the Samples by changing the back covers from a black cover to a blue one. Notably, the Samples received by Plaintiffs had been opened prior to their arrival and were not in the original manufacturer's packaging.

115.    Betson made these changes to deceive Plaintiffs by attempting to hide its infringing activities and the violation of its contractual obligations.

116.    Zayas-Bazan provided the false Verification to deceive Plaintiffs by attempting to hide Betson's infringing activities and the violation of its contractual obligations.

117.    The following are images of the Sample monitors showing that Betson changed the back covers from black to blue. As alleged above, Betson's website has images of Javelin Displays monitors with black back covers only.











118.    Accordingly, Plaintiffs seek redress for Betson's infringement of Plaintiffs'

intellectual property rights and breaches of contract, and Defendants' other misconduct and tortious behavior.

## COUNT I
## Trademark Infringement in Violation of the Lanham Act, 15 U.S.C. § 1114(1), Against Betson

119.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

120.    Betson, without authorization or consent from Plaintiffs, has used the Registered Trademarks to advertise, offer for sale, and sell products in such a manner and with the intent to cause, to have caused, and likely to continue to cause confusion, mistake, and deception among consumers that Betson is affiliated with Plaintiffs, the source of Plaintiffs' products, or that Plaintiffs approve, endorse, or sponsor Betson's use of the Registered Trademarks.

121.    Betson has acted with knowledge of Plaintiffs' ownership of the Registered Trademarks. Moreover, Betson has undertaken its infringing acts maliciously, willfully, and with the intent to cause confusion, mistake, and deception on the part of the public, to unjustly benefit from the goodwill and reputation of Plaintiffs, the Registered Trademarks, and Plaintiffs' products.

122.    Betson's use in commerce, without Plaintiffs' consent of one or more of the Registered Trademarks in connection with the sale, offering for sale, distribution, or advertising of goods, which use is likely to cause confusion or mistake, or to deceive consumers and therefore infringe Plaintiffs' rights in one or more of the Registered Trademarks, constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).

123. Upon information and belief, Betson has made and likely will continue to make substantial profits and gains from its wrongful acts which Betson is not entitled to in law or equity, and therefore Betson has been unjustly enriched.

124. Betson's actions have caused, and unless enjoined, will continue to cause, irreparable damage, harm and injury to Plaintiffs including, but not limited to, harm and injury to their business reputation and goodwill for which there is no adequate remedy at law.

125. Plaintiffs are therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a), including corrective advertising.

126. Pursuant to 15 U.S.C. § 1117(a), Plaintiffs also are entitled to recover damages in an amount to be determined at trial including, but not limited to, the profits made by Betson on the sale of the products bearing the Registered Trademarks, Plaintiffs' damages, and the costs of this action.

127. Plaintiffs also are entitled to recover treble damages, reasonable attorneys' fees, and prejudgment interest pursuant to 15 U.S.C. § 1117(a) and (b), because Betson's actions were undertaken willfully and in bad faith with the intent to cause consumer confusion, mistake, and deception.

**COUNT II**
**Unfair Competition and False**
**Designation Of Origin, 15 U.S.C. § 1125(a)(1)(A), Against Betson**

128. Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

129. Plaintiffs own enforceable trademark and trade dress rights, including in the Goldinger monitors and remote controls, which are distinctive and have acquired secondary meaning and substantial goodwill through extensive use and promotion in commerce.

40

130.    The look and feel of the Goldfinger monitors and Goldfinger remote controls embody a distinctive and protectable trade dress, including the design elements, appearance and use of colors, fonts, verbiage, the placement of elements, and other aspects of the products' "look and feel" alleged above.

131.    Betson has used the Infringing Monitor and Infringing Remote Control, which are confusingly similar marks and trade dress, in commercial advertising and promotion in interstate commerce in connection with the sale of products used in the gaming industry.

132.    Goldfinger is an established and reputable supplier of products to customers in the gaming industry that has built substantial goodwill and recognition associated with Plaintiffs' Trademarks and Plaintiffs' trade dress. Rather than developing its own distinctive brand identity, Betson has intentionally adopted marks, branding, and trade dress that trade on Plaintiffs' reputation for providing reliable, high-quality products. Betson's conduct is likely to cause consumer confusion and deception as to the source, sponsorship, or affiliation of its products, thereby exploiting Plaintiffs' goodwill for Betson's commercial benefit and causing damage to Plaintiffs' brand and business relationships.

133.    Betson's sales of Goldfinger products and the design of Betson's monitors and remote controls constitute unfair competition and a false designation of origin and are likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Betson with Plaintiffs, or as to the origin, sponsorship, or approval of Betson's goods by Plaintiffs.

134.    Betson is unlawfully passing off its goods as those of Plaintiffs by using confusingly similar trademarks and trade dress that mislead consumers into believing Betson's goods originate with, are affiliated with, or are endorsed by Plaintiffs.

135.    Betson's acts of infringement and misappropriation have been and are being

41

committed with actual knowledge of Plaintiffs' rights in the "look and feel" of Goldfinger products, and are willful, intentional, and in gross disregard of Plaintiffs' rights.

136. In addition, Betson engaged in unfair competition by misrepresenting to Plaintiffs' customers that Betson owned Goldfinger, that Goldfinger was going out of business, that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were not going to be made anymore, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors.

137. Plaintiffs have suffered and are likely to continue to suffer actual and imminent harm, including injury to their goodwill, brand reputation, and commercial interests, as a direct and proximate result of Betson's conduct. By reason of the foregoing, Betson is liable to Plaintiffs for unfair competition and false designation of origin under 15 U.S.C. § 1125(a), and Plaintiff is entitled to damages, injunctive relief, and such other relief as the Court deems just and proper.

## COUNT III
### False Advertising, 15 U.S.C. § 1125(a)(1)(B), Against Betson

138. Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

139. In violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), Betson has made false and misleading statements in commercial advertisements regarding its commercial activities and the Goldfinger products its purports to offer for sale and sell.

140. Betson's statements are literally false and/or likely to deceive a substantial portion of the relevant purchasing public about the qualities of the Goldfinger monitors it offers for sale.

141. Specifically, Betson claims in advertising that it is selling Goldfinger monitors that were "manufactured within the past two years." Because Okra terminated the 2018

42

Agreement effective October 25, 2023, Okra has not sold Betson any Goldfinger products since before that date. Thus, the Goldfinger products that Betson offers were manufactured more than two years ago.

142.    Betson has disseminated its false and misleading statements about its purported Goldfinger inventory to consumers on its mailing list, across the internet, and nationwide.

143.    Betson disseminated and directed its false and misleading statements as a part of its improper marketing scheme to target potential and actual customers of Goldfinger products in an effort to improperly increase its market share, revenue, and profits and damage Plaintiffs and the Goldfinger brand.

144.    Betson's false and misleading statements have already and will continue to materially influence purchasing decisions to the extent that customers choose Betson over Goldfinger or Goldfinger's authorized distributors to purchase Goldfinger monitors in reliance on Betson's false advertising.

145.    Betson's false statement is material because it leads consumers to believe that the Goldfinger products it is selling are covered by Goldfinger's warranty when, depending on their true date of manufacture, may not be.

146.    Betson's false and misleading advertising claims have resulted in the loss of prospective customers who, but for Betson's deceptive advertising claims, would have done business with Plaintiffs, and resulted in an increase in customers for Betson.

147.    As a proximate and direct result of Betson's wrongful and willful conduct, Plaintiffs have been damaged in an amount to be proven at trial, and Plaintiffs seek equitable and other relief, including injunctive relief, corrective advertising, treble damages, and attorneys' fees and interest.

## COUNT IV
### Violations of New Jersey's Trademark Act, N.J.S.A. § 56:3-13.16, Against Betson

148.     Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

149.     Betson, without authorization or consent from Plaintiffs, has used the Plaintiffs' Trademarks to advertise, offer for sale, and sell products in such a manner and with the intent to cause, to have caused, and likely to continue to cause confusion, mistake, and deception among consumers that Betson is affiliated with Plaintiffs, the source of Plaintiffs' products, or that Plaintiffs approve, endorse, or sponsor Betson's use of the Plaintiffs' Trademarks.

150.     Betson has acted with knowledge of Plaintiffs' ownership of the Plaintiffs' Trademarks.  Moreover, Betson has undertaken its infringing acts maliciously, willfully, and with the intent to cause confusion, mistake, and deception on the part of the public, to unjustly benefit from the goodwill and reputation of Plaintiffs, the Plaintiffs' Trademarks, and Plaintiffs' products.

151.     Betson's use in commerce, without Plaintiffs' consent, of one or more of the Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, or advertising of goods, which use is likely to cause confusion or mistake, or to deceive consumers and therefore infringe Plaintiffs' rights in one or more of the Plaintiffs' Trademarks, constitutes a violation of the New Jersey Trademark Act, N.J.S.A. § 56:3-13.16.

152.     Upon information and belief, Betson has made and likely will continue to make substantial profits and gains from its wrongful acts which Betson is not entitled to in law or equity, and therefore Betson has been unjustly enriched.

153.     Betson's actions have caused, and unless enjoined, will continue to cause,

irreparable damage, harm and injury to Plaintiffs including, but not limited to, harm and injury to their business reputation and goodwill for which there is no adequate remedy at law as Defendants continue to cause confusion, mistake, and deception on the part of the public.

154.    Plaintiffs are therefore entitled to injunctive relief pursuant to N.J.S.A. § 56:3-13.16(d).

155.     Pursuant to N.J.S.A. § 56:3-13.16(d), Plaintiffs also are entitled to recover damages in an amount to be determined at trial including, but not limited to, the profits made by Betson on the sale of the products bearing the Plaintiffs' Trademarks, Plaintiffs' damages, and the costs of this action.

156.    Plaintiffs also are entitled to recover treble damages, reasonable attorneys' fees, and prejudgment interest pursuant to N.J.S.A. § 56:3-13.16(d), because Betson's actions were undertaken willfully and in bad faith with the intent to cause consumer confusion, mistake, and deception.

**COUNT V**
**Unfair Competition In Violation of the**
**New Jersey Fair Trade Act, N.J.S.A. § 56:4-1, *et. seq.*, Against Betson**

157.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

158.    Plaintiffs' Trademarks are Plaintiffs' enforceable trademark and trade dress rights, including in Goldinger monitors and remote controls, which are distinctive and have acquired secondary meaning and substantial goodwill through extensive use and promotion in commerce.

159.    The look and feel of the Goldfinger monitors and Goldfinger remote controls embody a distinctive and protectable trade dress, including the design elements, appearance, and use of colors, fonts, verbiage, the placement of elements, and other aspects of the products' "look

45

and feel" alleged above.

160.    Betson has used the Plaintiffs' Trademarks and the Infringing Monitor and Infringing Remote Control, which are confusingly similar marks and trade dress, in commercial advertising and promotion in interstate commerce in connection with products used in the gaming industry.

161.    Goldfinger is an established and reputable supplier of products to customers in the gaming industry that has built substantial goodwill and recognition associated with the Plaintiffs' Trademarks, including Plaintiffs' trade dress. Rather than developing its own distinctive brand identity, Betson has intentionally adopted marks, branding, and trade dress that trade on Plaintiffs' reputation for providing reliable, high-quality products. Betson's conduct is likely to cause consumer confusion and deception as to the source, sponsorship, or affiliation of its products, thereby exploiting Plaintiffs' goodwill for Betson's commercial benefit and causing damage to Plaintiffs' brand and business relationships.

162.    Betson's sales of Goldfinger products and the design of Betson's monitors and remote controls constitute unfair competition and a false designation of origin and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Betson with Plaintiffs, or as to the origin, sponsorship, or approval of Betson's goods by Plaintiffs.

163.    Betson is unlawfully passing off its goods as those of Plaintiffs by using confusingly similar trademarks and trade dress that mislead consumers into believing Betson's goods originate with, are affiliated with, or are endorsed by Plaintiffs.

164.    Betson's acts of infringement and misappropriation have been and are being committed with actual knowledge of Plaintiffs' rights in the "look and feel" of Goldfinger products, and are willful, intentional, and in gross disregard of Plaintiffs' rights.

46

165.    In addition, Betson engaged in unfair competition by misrepresenting to Plaintiffs' customers that Betson owned Goldfinger, that Goldfinger was going out of business, that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were not going to be made anymore, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors.

166.    Plaintiffs have suffered and are likely to continue to suffer actual and imminent harm, including injury to their goodwill, brand reputation, and commercial interests, as a direct and proximate result of Betson's conduct. By reason of the foregoing, Betson is liable to Plaintiffs for violations of the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1, *et. seq.*, and Plaintiffs are entitled to damages, including trebled damages, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT VI**
**Common Law Trademark Infringement Against Betson**

167.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

168.    Plaintiffs own valid common law trademarks, including trade dress rights, which Plaintiffs have continuously used in commerce in connection with the advertisement, offer for sale, and the sale of goods to customers in the gaming industry.

169.    Plaintiffs' common law trademarks are valid trademarks under New Jersey law.

170.    Plaintiffs' common law trademarks are distinctive and protectable.

171.    Plaintiffs use in commerce of its trademarks and trade dress predate Betson's use of them.

172.    Plaintiffs have used in interstate commerce and in New Jersey its trademarks and trade dress in connection with the sale of goods for the gaming industry prior to Betson's

improper adoption and use of Plaintiffs' trademarks and trade dress rights.

173. Betson, without authorization or consent from Plaintiffs, have used trademarks, including trade dress, to advertise, offer for sale, and sell products in such a manner and with the intent to cause, to have caused, and likely to continue to cause confusion, mistake, and deception among consumers that Betson is affiliated with Plaintiffs or that Plaintiffs approve, endorse, or sponsor Betson's use of the trademarks in violation of Plaintiffs' common law trademark rights.

174. Betson has acted with knowledge of Plaintiffs' ownership of the trademarks. Moreover, Betson has undertaken its infringing acts maliciously, willfully, and with the intent to cause confusion, mistake, and deception on the part of the public, to unjustly benefit from the goodwill and reputation of Plaintiffs, Plaintiffs' trademarks, and Plaintiffs' products and brand.

175. Betson's use in commerce, without Plaintiffs' consent, of one or more of Plaintiffs' trademarks in connection with the sale, offering for sale, distribution, or advertising of goods, is likely to cause confusion or mistake, or to deceive consumers, and therefore, infringes Plaintiffs' rights in one or more of the trademarks and constitutes trademark and trade dress infringement in violation of the common law.

176. Betson's use of Plaintiffs' trademark rights was willful, intentional, and done with knowledge that the marks use was and is infringing.

177. Upon information and belief, from its wrongful acts, Betson has made and likely will continue to make substantial profits and gains to which Betson is not entitled to in law or equity, and therefore Betson has been unjustly enriched.

178. Betson's actions have caused, and unless enjoined, will continue to cause, irreparable damage, harm and injury to Plaintiffs including, but not limited to, harm and injury to their business reputation and goodwill for which there is no adequate remedy at law.

48

179.    Plaintiffs are therefore entitled to injunctive relief, to recover damages in an amount to be determined at trial including, but not limited to, the profits made by Betson on the sale of the products bearing the trademarks and trade dress, Plaintiffs' damages, and reasonable attorneys' fees and the costs of this action.

180.    Plaintiffs are entitled to injunctive relief because Betson's actions have caused, and unless enjoined, will continue to cause, irreparable damage, harm and injury to Plaintiffs including, but not limited to, harm to their business reputation and goodwill for which there is no adequate remedy at law.

## COUNT VII
## Breach of Contract Against Betson

181.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

182.    The Settlement Agreement is a valid and binding contract between Plaintiffs and Betson.

183.    Plaintiffs performed their obligations under the Settlement Agreement.

184.    Betson breached the Settlement Agreement by providing Samples that are not "reflective of the models that are currently offered in the marketplace."

185.    Betson breached the Settlement Agreement by providing a Verification that is not truthful.

186.    Betson breached the Settlement Agreement in bad faith and to mislead and deceive Plaintiffs by hiding its infringement of Plaintiffs' intellectual property.

187.    Betson breached the Settlement Agreement's non-disparagement clause by engaging in a campaign under which its personnel have been making false and disparaging statements in the market and to Plaintiffs' customers and business prospects about Goldfinger,

49

Goldfinger products, Goldfinger's financial status, and the company's business practices.

188.    Betson's breach of contract has caused Plaintiffs' damages in an amount to be determined at trial.

## COUNT VIII
## Defamation Against Betson

189.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

190.    Betson, by and through its personnel, made defamatory statements of fact about Goldfinger. Betson personnel have stated to Goldfinger's customers and business prospects that Goldfinger is going out of business, that the Goldfinger products were not going to be made anymore, and that the Goldfinger brand is going away.

191.    Betson's statements have been reported to Goldfinger by customers and potential customers.

192.    Betson's statements that Goldfinger is going out of business, that Goldfinger products are not going to be made anymore, and that the Goldfinger brand is going away are false, were made negligently, with malice and injurious intent, and are designed to damage Goldfinger's reputation and position in the marketplace.

193.    Betson's statements are slander *per se* because they affect Goldfinger in its business and trade.

194.    Betson's statements are false and injurious to Goldfinger's reputation and subject Goldfinger to the loss of goodwill and the confidence of Goldfinger's customers and potential customers.

195.    Betson's defamatory statements have caused Goldfinger damage, including actual harm to its reputation, lost sales, and lost customers and prospective customers, in an amount to

50

be determined at trial.

## COUNT IX
### Trade Libel Against Betson

196.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

197.    Betson, by and through its personnel, has intentionally made libelous statements of fact about Goldfinger. Betson personnel have stated to Goldfinger's customers and business prospects that Goldfinger is going out of business, that the Goldfinger products were not going to be made anymore, and that the Goldfinger brand is going away.

198.    Betson made these statements with knowledge of their falsity or reckless disregard for their falsity.

199.    As Okra's former distributor, Betson is aware that its statements that Goldfinger is going out of business, that the Goldfinger products were not going to be made anymore, and that the Goldfinger brand is going away are false, especially considering that Betson continues to use the Plaintiffs' Trademarks on its website to advertise and offer Goldfinger products for sale.

200.    Betson's statements have been reported to Goldfinger by customers and potential customers.

201.    Betson's statements that Goldfinger is going out of business, that Goldfinger products are not going to be made anymore, and that the Goldfinger brand is going away are false, were made with malice and injurious intent, and are designed to damage Goldfinger's reputation and position in the marketplace.

202.    Betson's statements about Goldfinger are false and injurious to Goldfinger's reputation and subject Goldfinger to the loss of goodwill and the confidence of Goldfinger's customers and potential customers.

203.    Betson's libelous statements about Goldfinger are calculated to prevent customers and potential customers from dealing with Goldfinger or otherwise to disadvantageously interfere with Goldfinger business relationships.

204.    Betson's  libelous statements about Goldfinger were material in inducing customers and potential customers not to deal or do business with Goldfinger and have disadvantageously interfered with Goldfinger's relations with customers and business prospects.

205.    Betson's libelous statements have caused Goldfinger special damages, including the lost customers alleged above, and lost sales and profits that would have resulted from dealing with these customers.

## COUNT X
## Tortious Interference With Contract Against Betson

206.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

207.    Betson intentionally and wrongfully interfered with Plaintiffs' customer relationships and contracts by falsely telling Goldfinger customers that Goldfinger is going out of business, that the Goldfinger products were not going to be made anymore, and that the Goldfinger brand is going away.

208.    Betson intentionally and wrongfully interfered with Plaintiff's customer relationships and contracts by stating to customers that Betson owns Goldfinger.

209.    Betson is not a party to Goldfinger's customer contracts.

210.    Betson knows the identity of Plaintiffs' customers because Betson is Okra's former distributor and aware of the companies that purchase Goldfinger products.

211.    Betson's interference was malicious and without justification because Betson made untrue statements and factual misrepresentations to Plaintiffs' customers about

Goldfinger's business, including falsely claiming that Betson owns Goldfinger, its financial condition, and the status of Goldfinger continuing as a business.

212.    Betson intentionally interfered with Plaintiffs' customer relationships and contracts so that it could divert Plaintiffs' customers to itself.

213.    Betson's tortious conduct has caused Plaintiffs damages in an amount to be determined at trial, including lost profits from the sales, servicing, and repair of monitors.

**COUNT XI**
**Tortious Interference With Prospective Economic Advantage Against Betson**

214.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

215.    Plaintiffs had and have a reasonable expectation of an economic benefit by selling goods and services to the gaming industry.

216.    Betson knew of Plaintiffs' expectancy because Betson is Okra's former distributor and advertises and sells products that infringe Plaintiffs' trademarks on its website and products that infringe Plaintiffs' trade dress rights under its Javelin Displays brand.

217.    Betson has intentionally and wrongfully interfered with Plaintiffs' expectancy by infringing Plaintiffs' intellectual property rights in order to divert Plaintiffs' sales and misappropriate Plaintiffs' business opportunities by advertising and selling Plaintiffs' products and creating the misimpression that Betson is affiliated with, owns, or has a relationship with Plaintiffs to attract consumers and then directing them on its website to products that compete with Plaintiffs' products to drive revenue and trade on Plaintiffs' goodwill.

218.    Betson has intentionally and wrongfully interfered with Plaintiffs' expectancy by infringing Plaintiffs' intellectual property rights in order to divert Plaintiffs' sales and misappropriate Plaintiffs' business opportunities by advertising and selling products that have the

53

look and feel of Plaintiffs' products.

219.    Betson has intentionally and wrongfully interfered with Plaintiffs' expectancy by telling potential customers of Goldfinger products that is going out of business, that Goldfinger products will no longer be made, and that the Goldfinger brand is going away.

220.    A reasonable probability exists that Plaintiffs would have received the anticipated economic benefit but for Betson's interference because Plaintiffs and Betson are direct competitors and Betson's tortious acts enabled it to take sales from Plaintiffs of what would have been Plaintiffs' customers.

221.    Betson engaged in these wrongful acts with malice, to harm Goldfinger, and to promote its compete Javelin Displays brand.

222.     Betson's tortious conduct has caused Plaintiffs' damages in an amount to be determined at trial, including lost profits from the sales, servicing, and repair of monitors.

**COUNT XII**
**Violations of the New Jersey Consumer Fraud Act,**
**N.J.S.A. § 56:8-2, *et. seq.*, Against Betson**

223.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

224.    Plaintiffs and Betson are direct competitors in the commercial sense.

225.    Plaintiffs' Goldfinger products compete directly with Betson's Javelin Brand products.

226.    Plaintiffs' Goldfinger products compete directly with the Goldfinger products that Betson advertises and sells without Plaintiffs' authorization and in violation of Plaintiffs' trademark and trade dress rights.

227.    Betson's infringing use of Plaintiffs' intellectual property rights has deceived and

54

will continue to deceive consumers in the gaming industry about the true nature of the parties' relationship and origin of Goldfinger products.

228.    In connection with its advertising and sales of competing products, Betson has intentionally omitted and concealed, with the intent to induce reliance, the material fact that Plaintiffs do not authorize, sponsor, endorse, or approve of Betson's use of their trademark and trade dress rights.

229.    Betson is Okra's former exclusive distributor. As a condition of the settlement of the Lawsuit, Betson was contractually obligated to send Plaintiffs the Samples, which are supposed to be "production models reflective of the models that are currently offered in the marketplace" to consumers.

230.    Betson modified the Samples to hide its infringing behavior in the marketplace.

231.    By sending the Samples to Goldfinger, Betson engaged in a consumer oriented transaction.

232.    Plaintiffs provided consideration under the Settlement Agreement in exchange for Betson's obligation to send Plaintiffs the Samples.

233.    Plaintiffs have been damaged due to Betson's deceptive conduct and statutory violations.

234.    Plaintiffs are entitled to recover as damages a refund of all moneys Betson acquired by means of its unlawful and violative practices.

### COUNT XIII
### Unfair Competition Against Defendants

235.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

236.    Betson's conduct, as alleged herein, constitutes unfair competition under New Jersey

55

common law.  Betson's acts have resulted in the "passing off" of Betson's products as those of Plaintiffs, or as somehow related or associated, or sponsored or endorsed by Plaintiffs.

237.   Betson's misappropriation of Plaintiffs' name, brand,  intellectual property, reputation and goodwill is likely to cause confusion or to deceive consumers as to the origin of the infringing products, which constitutes unfair competition under New Jersey common law.

238.   Betson's use of the Plaintiffs' intellectual property  has been in  bad faith, willful, intentional, and done with knowledge that Betson's use was and is infringing.

239.   In addition, Betson unfairly competed by misrepresenting to Plaintiffs' customers that Betson owned Goldfinger, that Goldfinger was going out of business, that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were not going to be made anymore, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors.

240.   Zayas-Bazan has unfairly competed by providing the false Verification to conceal from Plaintiffs that Betson is infringing Plaintiffs' trade dress rights.

241.   Upon information and belief, from its wrongful acts, Betson has made and will likely continue to make substantial profits and gains to which Betson is not entitled to in law or equity, and therefore Betson has been unjustly enriched.

242.   Betson's actions have caused, and unless enjoined, will continue to cause, irreparable damage, harm and injury to Plaintiffs including, but not limited to, their business reputation and goodwill for which there is no adequate remedy at law.

243.   Plaintiffs also are entitled to recover damages (whether direct or indirect) including, but not limited to, the profits made by Betson on the sale of infringing products, in an amount to be determined at trial.

## COUNT XIV
### Unjust Enrichment Against Betson

244.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

245.    Betson, by its actions described herein, has misappropriated Plaintiffs' intellectual property for its own use and gain.

246.    Upon information and belief, Betson plans to continue to use and infringe Plaintiffs' intellectual property.

247.    Upon information and belief, from its wrongful acts, Betson has made and will likely continue to make substantial profits and gains to which it is not entitled to in law or equity.

248.    Based on principles of equity and good conscience, Betson must not be permitted to retain the gains, revenues, and other benefits it has unjustly obtained through its exploitation of Plaintiffs' intellectual property and associated goodwill.

249.    As a result of Betson's wrongful acts, Betson has been unjustly enriched to Plaintiffs' detriment in an amount to be determined at trial.

## COUNT XV
### Fraud Against Defendants

250.    Plaintiffs hereby incorporate by reference all preceding allegations as if fully set forth herein.

251.    On March 2, 2026, and pursuant to the Settlement Agreement, Goldfinger received the Samples shipped by Betson.

252.    In connection with the Samples, Betson provided Plaintiffs with the Verification,

57

dated February 12, 2026.

253.    Zayas-Bazan signed and made false statements in the Verification in his capacity as Betson's President. Betson provided the false Verification to Plaintiffs purportedly pursuant to the Settlement Agreement.

254.    In the Verification, Zayas-Bazan "verifies and affirms under oath and penalty of perjury that the Samples included in Betson's Shipment are production models reflective of the models that are currently offered in the marketplace."

255.    In the Verification, Betson made material factual misrepresentations to Plaintiffs. Specifically, the representation in the Verification that the Samples that Betson shipped to Goldfinger are "production models reflective of the models" that Betson currently offers in the marketplace under the Javelin Displays brand is false.

256.    That statement is false because Betson modified the Samples by changing the back covers from a black cover to a blue one. Notably, the Samples received by Plaintiffs had been opened prior to their arrival and were not in the original manufacturer's packaging.

257.    Defendants know the statements in the Verification are false because they contradict the appearance of Betson monitors that Betson advertises and sells through its website, and Zayas-Bazan, as Betson's President, is knowledgeable about the features of products that Betson actually offers in the marketplace to consumers.

258.    Betson made these changes to deceive Plaintiffs by attempting to hide its infringing activities and the violation of its contractual obligations.

259.    Zayas-Bazan provided the false Verification to deceive Plaintiffs by attempting to hide Betson's infringing activities and the violation of its contractual obligations.

260.    Defendants provided the false Verification to induce Plaintiffs to rely on the

statements contained therein and to believe that Betson was performing its obligations under the

Settlement Agreement and not infringing Plaintiffs' intellectual property rights.

261.    Plaintiffs reasonably relied on Betsons' misrepresentations, and Betsons' false

statements have caused Plaintiffs damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against

Betson as follows:

A.  Adjudicating that Defendants have:

(1)  violated Section 32 of the Lanham Act, 15 U.S.C. § 1114;

(2)  violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(3)  violated Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), willfully, intentionally and with knowledge of its infringement;

(4)  violated New Jersey's Trademark Act, N.J.S.A. § 56:3-13.16;

(5)  violated the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1, *et. seq.;*

(6)  engaged in trademark infringement in violation of New Jersey common law;

(7)  breached the Settlement Agreement;

(8)  defamed Plaintiffs;

(9)  committed trade libel against Plaintiffs;

(10) tortiously interfered with Plaintiffs' contracts and customer relationship;

(11) tortiously interfered with Plaintiffs' prospective economic advantage;

(12) violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq.*;

(13) engaged in unfair competition in violation of the common law;

(14) been unjustly enriched in violation of the common law; and

(15) committed fraud as against Plaintiffs.

59

B.  Granting a temporary restraining order, and a preliminary and a permanent injunction, pursuant to Federal Rule of Civil Procedure 65, 15 U.S.C. § 1116(a), the New Jersey Fair Trade Act and Trademark Act, the common law of the State of New Jersey, and any other applicable authority, restraining and enjoining Betson and its officers, agents, employees, assigns, successors-in-interest, and attorneys, and all those persons or entities in active concert or participation with Betson who receive notice of the order by personal service or otherwise, from:

(1)  Manufacturing, importing, exporting, purchasing, advertising, marketing, promoting, supplying, distributing, offering for sale, and/or selling any products that bear the Plaintiffs' Trademarks and/or any other mark or design element substantially indistinguishable from or identical with the Plaintiffs' Trademarks and Plaintiffs' common law trademarks and trade dress, including, without limitation, infringing products purporting to be Plaintiffs' products, and engaging in any other activity constituting an infringement on any of Plaintiffs' trademark rights;

(2)  Using in any manner the Plaintiffs' Trademarks or any reproduction, counterfeit, copy, colorable imitation, or confusingly similar variation thereof;

(3)  Engaging in acts that constitute infringement, unfair competition, false representation, or false designation of origin under federal or state laws;

(4)  Inducing, encouraging, instigating, assisting, aiding, abetting or contributing to any of the aforesaid acts set forth in paragraphs B(1)-(3); and

(5)  Communicating about this action with any customers, potential customers, suppliers, potential suppliers, or any other persons or entities in active concert or participation with Betson concerning the acts complained of herein.

C.  An Order requiring Betson to maintain all books and records of its business including, but not limited to, invoices, receipts, contracts, purchase orders, customer lists, advertisements, catalogues, offers to sell, and any other documents concerning the acts complained of herein.

60

D.  An Order requiring Betson to take any actions as may be directed by this Court for the purpose of attempting to remediate any consumer confusion or any loss of goodwill suffered by Plaintiffs as a result of Betson's wrongful acts;

E.  An Order requiring Betson to recall from any distributors, wholesalers, retailers, customers, and others and deliver to the Court any and all infringing goods, products, advertisements, promotional and marketing materials, and packaging that display Plaintiffs' trademarks and trade dress, as well as all equipment or other means used for making same.

F.  An Order requiring Betson to file with this Court and to serve on Plaintiffs within thirty days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Betson has complied with the injunction.

G.  An Order directing such other and further relief as the Court may deem appropriate to prevent consumers, the public, and/or the trade from deriving any erroneous impression that any infringing product at issue in this action has been manufactured, imported, advertised, marketed, promoted, supplied, distributed, offered for sale, and/or sold by Betson has been authorized by Plaintiffs, or is related in any way with Plaintiffs and their products.

H.  An Order requiring:

(1)  Betson to account for and pay over to Plaintiffs an amount equal to three times all of Betson's profits, gains, savings, and advantages derived from their unlawful conduct, and to the full extent provided for by Section 35(a) of the Lanham Act, 15 U.S.C. § 1117;

(2)  As an alternative to awarding profits under Section 35(a), awarding Plaintiffs' statutory damages as provided for by Section 35(c) of the Lanham Act, 15 U.S.C. § 1117 (c);

(3)  Betson to pay over to Plaintiffs an amount equal to three times Plaintiffs'

61

actual damages suffered as a result of Betsons' infringing activities;

(4) Betson to reimburse Plaintiffs' attorneys' fees and costs incurred as a result of Betson's infringing activities, including all attorneys' fees and costs incurred in this action, to the fullest extent provided for by law, including pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

(5) Awarding Plaintiffs compensatory damages;

(6) Awarding Plaintiffs restitution and/or disgorgement of all profits, revenues and other benefits unjustly obtained by Betson;

(7) Awarding Plaintiffs punitive damages to the fullest extent provided by law;

(8) Awarding Plaintiffs' pre-judgment and post-judgment interest on any monetary award made part of the judgment against Betsons; and

(9) Awarding Plaintiffs such additional and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs respectfully demand a jury trial on all claims and issues so triable.

Dated: April 8, 2026

By: s/ William C. Baton
William C. Baton
Alexander L. Callo
**SAUL EWING LLP**
One Riverfront Plaza
1037 Raymond Blvd., Suite 1520
Newark, NJ 07102
wbaton@saul.com
alexander.callo@saul.com
973-286-6722

*Attorneys for Plaintiffs*
*Okra Holdings, Inc. and Goldfinger, Inc.*

62

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 & 40.1</u>

Pursuant to Local Civil Rules 11.2 and 40.1, I hereby certify that the matter in controversy is related to *H. Betti Industries, Inc. v. Okra Holdings, Inc.*, Civil Action No. 24-3168 (CCC)(AME) (D.N.J.) because the matter in controversy grows out of the same transaction at issue in *H. Betti Industries*, which case was initiated on March 15, 2024 and terminated on January 22, 2026.

Pursuant to Local Civil Rules 11.2 and 40.1, I further certify that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: April 8, 2026

By: s/ William C. Baton
  William C. Baton
  Alexander L. Callo
  **SAUL EWING LLP**
  One Riverfront Plaza
  1037 Raymond Blvd., Suite 1520
  Newark, NJ 07102
  wbaton@saul.com
  alexander.callo@saul.com
  973-286-6722

  *Attorneys for Plaintiffs*
  *Okra Holdings, Inc. and Goldfinger, Inc.*