William C. Baton
Alexander L. Callo
**SAUL EWING LLP**
650 College Road East, Suite 4000
Princeton, NJ 08540
wbaton@saul.com

*Attorneys for Plaintiffs*
*Okra Holdings, Inc. and Goldfinger, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OKRA HOLDINGS, INC. and GOLDFINGER, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>H. BETTI INDUSTRIES, INC. D/B/A BETSON IMPERIAL PARTS & SERVICE and RICHARD ZAYAS-BAZAN,<br><br>Defendants. | Civil Action No. 26-3726 (JXN) (SDA)<br><br>(Filed Electronically) |

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' NOTICE OF MOTION FOR DISMISSAL OF CERTAIN ENUMERATED COUNTS OF PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

RELEVANT FACTUAL ALLEGATIONS ..... 3

ARGUMENT ..... 9

A. The Standard on a Motion to Dismiss ..... 9

B. The Complaint States Tortious Interference Claims ..... 10

1. The Complaint Properly Alleges Malice, Causation, and Damages ..... 10

2. The Economic Loss Doctrine Does Not Apply to Counts X or XI ..... 12

C. The Complaint States a Claim Under New Jersey's Consumer Fraud Act ..... 13

D. The Complaint States a Claim for Unjust Enrichment ..... 17

E. The Fraud Claim Against Defendants Is Not Barred by the Economic Loss Doctrine, and Zayas-Bazan Can Be Found Liable Under the Participation Theory ..... 20

1. The Economic Loss Doctrine Does Not Apply to the Fraud Claims Against Defendants ..... 20

2. Zayas-Bazan May Be Liable Due to His Participation in the Fraud ..... 22

F. The Complaint States a Claim for Unfair Competition Against Zayas-Bazan ..... 23

G. Plaintiffs Should Be Granted Leave to Replead Any Claim That is Dismissed ..... 25

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Absorption Pharms., LLC v. Reckitt Benckiser LLC*, No. 17-12872, 2020 WL 10139487 (D.N.J. June 25, 2020) ... 21

*Alston v. Parker,* 363 F. 3d 229 (3d Cir. 2004) ... 25

*Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000) ... 26

*American Cyanamid Co. v. Sterling Drug, Inc.*, 649 F. Supp. 784 (D.N.J. 1986) ... 18

*Argueta v. U.S. Immigration and Customs Enforcement,* 643 F. 3d 60 (3d. Cir. 2011) ... 9, 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ... 9

*Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005) ... 18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ... 9

*Bellocchio v. New Jersey Dept. of Environmental Protection,* 16 F. Supp. 3d 367 (D.N.J. 2014) ... 25

*Bistrian v. Levi*, 696 F.3d 352 (3rd Cir. 2012) ... 9

*Chen v. Wang*, No. 22-4708 (MAS) (JBD), 2024 WL 4771305 (D.N.J. Nov. 12, 2024) ... 21, 22

*Choice is Yours, Inc. v. Williams*, No. 2:14-cv-01804, 2016 WL 5661709 (E.D. Pa. Sept. 30, 2016) ... 19

*CLI Interactive, LLC v. Diamond Phil's, LLC*, No. 2:22-cv-01602-JXN-CLW, 2023 WL 1818381 (D.N.J. Feb. 8, 2023) (Neals, J.) ... 12, 20, 22, 25

*Conte Bros. Auto. v. Quaker State-Slick 50, Inc.*, 992 F. Supp. 709 (D.N.J. 1998) ... 17

*Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592 (D.N.J. 2000) ... 23, 24

*Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407 (D.N.J. 2021) ... 12

*EP Henry Corp. v. Cambridge Pavers, Inc.*, No. CV 17-1538, 2017 WL 4948064 (D.N.J. Oct. 31, 2017) ... 17

*Flint Group Packaging Inks N. Am. Corp. v. Fox Indus., Inc.*, No. 16-cv-03009, 2020 WL 6156750 (D.N.J. Oct. 20, 2020) ... 14, 15, 16, 17

*Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F. Supp. 693 (D.N.J. 1977) ... 23, 24

*G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583 (D.N.J. 2014) ....................20, 22, 23

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12 Civ. 7992, 2014 WL 185222 (S.D.N.Y. Jan. 16, 2014)....................19, 20

*Hart v. Electronic Arts, Inc.*, 740 F. Supp. 2d 658 (D.N.J. 2010) ....................17

*Howard Hess Dental Lab. Inc. v. Dentsply Intern., Inc.,* 602 F. 3d 237 (3d Cir. 2010)....................9

*Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 11–1857(DMC)(JAD), 2012 WL 5554543 (D.N.J. Nov. 14, 2012)....................13

*I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"* 500 F. Supp. 3d 380 (E.D. Pa. 2020) ....................19

*Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009) ....................18

*MJF Elec. Cont., Inc. v. Toms River Bd. of Ed.*, No. 20-7336, 2021 WL 1168962 (D.N.J. Mar. 26, 2021) ....................22

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)....................10

*Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449 (D.N.J. 2020) ....................12, 13

*Rocks v. City of Philadelphia*, 868 F.2d 644 (3d Cir. 1989)....................9

*SRC Constr. Corp. of Monroe v. Atlantic City Housing Auth.*, 935 F. Supp. 2d 796 (D.N.J. 2013) ....................21, 25

*State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668 (D.N.J. 2009) ....................12, 21

*Trico Equipment, Inc. v. Manor*, No. 08–5561, 2011 WL 705703 (D.N.J. Feb. 22, 2011)....................13

**State Cases**

*All the Way Towing, LLC v. Bucks County Int'l, Inc.*, 236 N.J. 431 (2019)....................14

*D'Agostino v. Maldonado*, 216 N.J. 168 (2013)....................14

*E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 307 N.J. Super. 546 (Ch. Div. 1996), *aff'd*, 307 N.J. Super. 438 (App. Div. 1997)....................10

*Goldsmith v. Camden Cnty. Surrogate's Office*, 408 N.J. Super. 376 (2009) ....................17

*Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557 (2011)....................14

*Hoffman v. Loiry*, A-2640-14T3, 2016 WL 3693957 (N.J. App. Div. July 13, 2016) ....................13, 15

*Lamorte Burns & Co. v. Walters*, 167 N.J. 285 (2001) ....................10

*Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739 (1989)....................10

*Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297 (2002) ....................20, 22, 23

**FEDERAL RULES & STATUTES**

15 U.S.C. § 1117(a) ....................18

Fed. R. Civ. P. 9(b) ....................21

Fed. R. Civ. P. 15(a)(2)....................26

**STATE STATUTES**

N.J.S.A. 56:8-1(c) ....................14, 15

**OTHER AUTHORITIES**

Restatement (Third) of Restitution and Unjust Enrichment § 42 ....................20

## INTRODUCTION

Defendants do not move against Plaintiffs' trademark and trade dress infringement, false advertising, breach of contract, defamation, or trade libel claims. Instead, Defendants ask this Court to dismiss six tort counts by mischaracterizing this case as "a textbook dispute between businesses rooted in contract and trademark law." The Complaint, however, alleges far more than that, and Defendants' misleading presentation of Plaintiffs' claims fails in the face of the Complaint's well-pleaded allegations of Defendants' disparagement, fraud, and concealment, which must be read as a whole and in the light most favorable to Plaintiffs. Each challenged count therefore states a claim and Defendants' motion should be denied in its entirety.

First, Plaintiffs' tortious interference with contract (Count X) and prospective economic advantage (Count XI) claims are based on allegations that Betson's salesforce falsely told Goldfinger's customers and prospects that "Betson owns Goldfinger," that Goldfinger was going out of business, and that Betson was discontinuing its monitors. Fraudulent statements are the paradigm of malice, because they are intentional, wrongful conduct without justification, and not healthy competition. Plaintiffs identify nearly twenty specific lost customers and quantify the resulting harm, which is all that is required to plead causation and damages. Because Betson's intentional misconduct targets Goldfinger's relationships with third-party customers, Counts X and XI are not barred by the economic loss doctrine.

Second, courts broadly construe the New Jersey Consumer Fraud Act (the "CFA") to root out fraud's various manifestations. The CFA's definition of "merchandise" covers goods "offered, directly or indirectly to the public for sale," and Betson contractually agreed that the sample Javelin Displays monitors it sent to Goldfinger are precisely that – reflective of production models it sells to the public. Defendants' lone argument – that Count XII arises solely from the parties' settlement agreement – inaccurately describes the gist of the claim. The

Complaint alleges that Betson's infringing use deceives consumers as to the source of Goldfinger products and the parties' relationship, and that Betson modified the sample monitors to conceal its infringement. The parties are direct competitors, and Plaintiffs gave Betson consideration for the sample monitors, placing them in a consumer-oriented transaction. Thus, Count XII properly states a claim under the CFA.

Third, Count XIII against Defendant Richard Zayas-Bazan should survive because unfair competition is an amorphous, flexible tort. It is a species of deceit that includes passing off and source confusion. It is not limited to the "misappropriation of property" as Defendants baselessly contend. The Complaint alleges that Zayas-Bazan signed a fraudulent Verification to conceal Betson's infringement. Notably, a corporate officer can be personally liable for his deceptive conduct regardless of his corporate capacity, and the economic loss doctrine does not shield Zayas-Bazan because he is not a party to a contract with Plaintiffs and his alleged misconduct was extrinsic to Betson's contractual commitments.

Next, the Complaint alleges that Betson was unjustly enriched by retaining the profits it generated by infringing Plaintiffs' trademarks and trade dress. Because Defendants do not move against Plaintiffs' infringement claims, Plaintiffs are entitled to recover Betson's profits from its infringement as restitution, and the unjust enrichment count should survive with those claims. Defendants' lone argument is that Plaintiffs have not alleged that they conferred a benefit on Betson. Defendants are wrong. The Complaint alleges that Okra granted Betson the exclusive right to sell and distribute Goldfinger products worldwide. That is a benefit, and one Betson unjustly retained by infringing Plaintiffs' trademarks after its exclusive right terminated. These allegations are sufficient at the pleading stage and the Court should not dismiss Count XIV.

Last, Defendants' arguments on Count XV – the fraud claim – miss the mark. The economic loss doctrine does not bar the claim against Defendants, because their fraud concealed the breach of an independent, legally imposed duty not to infringe Plaintiffs' intellectual property – a right extraneous to the contract. As for Zayas-Bazan, a corporate officer who personally commits an intentional tort is subject to liability under the participation theory; and, the economic loss doctrine does not apply because he is not a party to a contract with Plaintiffs, and his fraudulent acts were independent of Betson's contractual obligations.

As detailed more fully below, the Court should deny Defendants' motion in its entirety.

## RELEVANT FACTUAL ALLEGATIONS

Goldfinger, a wholly owned subsidiary of Okra, sells monitors and related equipment to customers primarily in the gaming industry, with a national customer base of large and small businesses. Dkt. No. 1, Complaint ("Compl."), ¶¶ 15, 16, 23. Okra owns four federally registered trademarks for the Goldfinger brand (the "Registered Trademarks"), which it has spent considerable time, money, and resources developing. Compl., ¶¶ 3, 34-36, 38, 43. As a result of Plaintiffs' efforts, Goldfinger monitors are widely recognized by gaming industry professionals and other consumers as high-quality products. *Id.* at ¶ 43.

This case arises out of, *inter alia*, Betson's willful trademark infringement and tortious interference with Goldfinger's customers and business prospects, as well as Defendants' unfair competition and deceptive efforts to conceal Betson's intellectual property violations.

Betson is Okra's former exclusive distributor of Goldfinger products, and the parties' business relationship was set forth in a Distributor Agreement that Okra and Betson entered in 2018 (the "2018 Agreement"). Compl., ¶¶ 52-54. On July 27, 2023, Okra terminated the 2018 Agreement, effective October 25, 2023, because Betson failed to perform its contractual obligations. *Id.* at ¶¶ 55-56. After the 2018 Agreement ended, Betson sued Okra (the "Lawsuit"),

and began infringing the Registered Trademarks and making false statements about Goldfinger that were designed to confuse consumers and damage its reputation in the marketplace. *Id*. at ¶¶ 37, 57, 61, 76-80.

In early 2024, Goldfinger began receiving customer reports that Betson personnel were falsely telling them that "Betson owns Goldfinger," that Betson had decided to phase out the Goldfinger brand, and that Goldfinger monitors were going away. *Id*. at ¶¶ 58, 208. As the former exclusive distributor of Goldfinger products, Betson knows the identities of Goldfinger's customers and the companies that purchase Goldfinger products. *Id*. at ¶ 210, 216. Betson made these statements to trade on Goldfinger's reputation and goodwill, and to mislead consumers that Goldfinger and Betson were affiliated in some way so they would be under the misimpression that Betson was the source of and controlled the commercialization of Goldfinger-branded products. *Id*. at ¶¶ 59.

On top of its trademark infringement and false statements to Goldfinger customers, Betson launched its Javelin Displays brand monitors in or around September 2024 and became Goldfinger's direct competitor. Compl., ¶¶ 62-64, 224-25. In conjunction with the commercialization of Javelin Displays products, Betson modified the false and disparaging statements it was making to customers about Goldfinger. Specifically, Goldfinger has received reports that Betson was telling consumers that Goldfinger was going out of business, that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were no longer being made, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors. Compl., ¶¶ 65, 207.

Betson's malicious marketing strategy worked, because its false statements caused Goldfinger to lose significant sales and damaged its relationships with customers and business

prospects. The Complaint identifies nearly twenty companies that, as a result of Betson's disparagement and misinformation campaign, are former Goldfinger customers. *Id*. at ¶ 66. Not only has Betson's tortious conduct resulted in lost product sales, but it has robbed Goldfinger of more than $200,000 in revenue that would have been generated from servicing and repairing out-of-warranty monitors. *Id*. at ¶ 67.

Moreover, the look and feel of Goldfinger monitors and remote controls embody a distinctive and protectable trade dress owned by Plaintiffs. *Id*. at ¶¶ 44, 46. The Complaint alleges how Betson, as Goldfinger's direct competitor, has been offering Javelin Displays products to consumers which infringe Plaintiffs' trade dress, as well as Defendants' efforts to conceal Betson's infringement. *See id*. at ¶¶ 92-97.

In March 2025, Plaintiffs inspected a Javelin Displays 43" monitor. Plaintiffs' inspection revealed that Betson copied numerous aspects of Plaintiffs' trade dress and product design features. Compl., ¶ 92. Betson has intentionally made its monitors look as similar as they can to a Goldfinger monitor to confuse customers by mimicking the appearance and arrangement of elements on the back cover of Javelin Displays monitors, including the use and layout of arrows and related verbiage, the use of colors, and the overall mood, style, and impression of the items. *Id*. at ¶ 94.

As depicted below, a side-by-side comparison of the Goldfinger monitor (right) and Javelin Displays monitor (left) shows that Betson copied several visual design features.




*Id*. at ¶ 95.

Notably, Betson has offered 32” and 43” Javelin Displays monitors for sale on the Javelin Displays website with a black back cover, as shown below.






*Id.* at ¶ 75.

The parties settled the Lawsuit in January 2026 and entered into the Confidential Settlement Agreement and Mutual Release (the "Settlement Agreement"), which required Betson to ship one 32" and one 43" Javelin Displays monitor to Goldfinger (the "Samples"), and "verify and affirm that the Samples are production models reflective of the models that are currently offered in the marketplace." *Id.* at ¶ 69, 72, 74. Plaintiffs provided consideration under the Settlement Agreement in exchange for the Samples. *Id.* at ¶ 232.

In or around March 2026, Plaintiffs received the Samples from Betson. *Id.* at ¶ 111. However, there was a significant difference between the Samples and the Javelin Displays monitors that Betson advertises for sale on the internet. Specifically, Betson changed the Samples' back covers from black to blue to conceal its trade dress infringement from Plaintiffs, as shown below.




*Id*. at ¶¶ 114-15, 117, 227-30.

In connection with sending the Samples, Betson provided Plaintiffs with a Verification signed by its President, Richard Zayas-Bazan, in which he "verifies and affirms under oath and penalty of perjury that the Samples included in Betson's Shipment are production models reflective of the models that are currently offered in the marketplace." Compl., ¶ 112. Contrary to his representations in the Verification, the Samples were not "production models reflective of the models" offered for sale by Betson because Betson changed the back covers from black to blue to hide its infringement. *Id*. at ¶¶ 113-15, 230, 258. Zayas-Bazan provided the false Verification to help Betson cover up its infringement. *Id*. at ¶¶ 116, 240, 259-60.

All the while, Betson continued to infringe the Registered Trademarks, even after having received two cease and desist letters, including one sent in February 2026. Compl., ¶¶ 68, 76-91, 103-04, 226-28. In sum, Betson's intellectual property violations and false statements to consumers about Goldfinger are part of its improper competitive strategy to trade on Goldfinger's reputation and goodwill by infringing the Registered Trademarks, and to disparage

Goldfinger and damage its reputation to give its competing Javelin Displays monitors an unfair advantage in the marketplace. *Id.* at ¶¶ 57, 217-21.

## ARGUMENT

### A. The Standard on a Motion to Dismiss

For a motion to dismiss under Rule 12(b)(6), "the applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bistrian v. Levi*, 696 F.3d 352, 365 (3rd Cir. 2012) ("The touchstone of the pleading standard is plausibility.").

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated differently, plausibility requires that the factual allegations "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. It is gauged by drawing not only on "judicial experience," but also on "common sense." *Iqbal*, 556 U.S. at 679. Courts are obligated "to read allegations not in isolation but as a whole and in context." *Howard Hess Dental Lab. Inc. v. Dentsply Intern., Inc.,* 602 F. 3d 237, 256 (3d Cir. 2010); *see Argueta v. U.S. Immigration and Customs Enforcement,* 643 F. 3d 60, 74 (3d. Cir. 2011)(noting that "courts must determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim").

"While detailed factual allegations are not required, the pleading must include more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation,' 'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertion[s].'" *Argueta*, 643

F.3d at 72 (quoting *Iqbal* and *Twombly*). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*).

As shown below, each cause of action challenged by Defendants is supported by well-pleaded, factual allegations that detail Defendants' wrongful acts and plausibly states a claim for which relief can be granted. The Court should therefore deny the motion in all respects.

**B. The Complaint States Tortious Interference Claims**

1. The Complaint Properly Alleges Malice, Causation, and Damages

Betson wrongly claims that Counts X and XI do not allege malice, causation, or damages. First, for tortious interference, "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989). Courts assess malice "on an individualized basis," apply a "flexible" standard, and it is often "stated that the relevant inquiry is whether the conduct was sanctioned by the rules of the game." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 306-07 (2001). Malice in this context can be "violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law." *E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 307 N.J. Super. 546, 559 (Ch. Div. 1996), *aff'd*, 307 N.J. Super. 438 (App. Div. 1997). A competitor's profit motive is not justified where the means are improper, because "[t]he justification must be as broad as the act, and must cover not only the motive and the purpose … but also the means used." *Printing Mart-Morristown*, at 758-59 (quoting *Di Cristofaro v. Laurel Grove Memorial Park*, 43 N.J. Super. 244, 255 (App. Div. 1957)).

The Complaint alleges precisely those kinds of unjustified acts in factual detail. Betson's salesforce allegedly and falsely told Plaintiffs' customers and prospective purchasers that

"Betson owns Goldfinger," that Goldfinger was going out of business, that its monitors were being discontinued, and that Javelin Displays are a "new and improved version of Goldfinger monitors." Compl. ¶¶ 57-59, 65, 211, 217, 219. The Complaint alleges specific misrepresentations by Betson as a means – not conclusory statements, as Betson wrongly contends – and Betson's fraud constitutes malice under New Jersey law.

Moreover, the Complaint alleges that Betson tortiously interfered by infringing Plaintiffs' intellectual property rights to divert their customers and business opportunities by "creating the misimpression that Betson is affiliated with, owns, or has a relationship with Plaintiffs . . . to drive revenue and trade on Plaintiffs' goodwill." Compl., ¶ 217. Here, too, the Complaint gives specific examples of this, such as Betson violating the law by using the Registered Trademarks in an infringing manner to (1) advertise products Betson did not have in stock, and (2) direct customers to competing products, such as Raw Thrills brand monitors. *Id.* at ¶¶ 88-89.

Betson cites only paragraphs 211 and 221 in isolation without mentioning the above-cited allegations, which supply specific false statements and violations of law. As a result, Betson misleadingly presents only paragraphs 211 and 221 – divorced from the incorporated facts – as the relevant allegations. The Court should reject Betson's sleight of hand.

The same is true of Betson's meritless contentions on causation and damages. The Complaint names approximately twenty lost customers, whose identity Betson knows because it formerly distributed Goldfinger products. *Id.* at ¶¶ 66, 210, 216. Likewise, the Complaint alleges more than $200,000 in lost revenue from servicing and repairing out of warranty items. *Id.* at ¶ 67. Plaintiffs allege that Betson's false statements about Goldfinger, including that Goldinger "is going out of business" and "unable to repair monitors," and Betson's dishonest exploitation of its status as a distributor-turned-competitor, caused Plaintiffs' lost monitor sales and revenue from

servicing products. *Id*. at ¶¶ 66-67, 220. Betson ignores these well-pleaded factual allegations which require the denial of its motion.

2. The Economic Loss Doctrine Does Not Apply to Counts X or XI

Betson misguidedly asserts that the economic loss doctrine "bars a party with a contract claim from recovering in tort." Memo at 9. Instead, "the focus of the inquiry as to whether the economic loss doctrine applies is . . . whether the plaintiff's entitlement to economic losses flows directly from obligations set forth in a contract ***between the parties***." *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 676-77 (D.N.J. 2009) (emphasis added).

Here, the Complaint does not allege that Betson tortiously interfered with a contract it had with Plaintiffs. Rather, Betson is alleged to have directed its tortious conduct at third-parties, namely, Plaintiffs' customers and prospective purchasers of its products. *See* Compl., ¶¶ 66-67, 207-08, 217. For this reason, the economic loss doctrine does not apply.

Also, the economic loss doctrine does not bar tortious interference claims "when a plaintiff alleges that the defendant's conduct breached an 'independent duty,'" including, "the duty not to provide false, damaging information to third parties." *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 423 (D.N.J. 2021). *See CLI Interactive, LLC v. Diamond Phil's, LLC*, No. 2:22-cv-01602-JXN-CLW, 2023 WL 1818381, at *8 (D.N.J. Feb. 8, 2023) (Neals, J.) ("tort claims are barred where entitlement thereto 'flows *only* from a contract'") (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995) (emphasis in original).

In *Durr*, the third party was a surety the defendant interfered with by telling it "that Durr was likely to default, when in fact, PSEG owed Durr payment." *Id*. at 422. The alleged misconduct was not addressed by a contract between the parties, and the economic loss doctrine did not apply. *Id*. at 423. *See Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d

449, 464–465 (D.N.J. 2020) (denied dismissal under the economic loss doctrine where the defendant allegedly contacted and told the plaintiff's customers that it "would not be able to provide materials required to perform").

That is the very situation here. The Complaint alleges that Betson falsely told Goldfinger's customers and prospects that "Betson owns Goldfinger," that "Goldfinger was going out of business," that Betson had decided to phase out Goldfinger monitors, that Goldfinger monitors were not going to be made anymore, and that Betson's Javelin Displays monitors were a new and improved version of Goldfinger monitors. Compl., at ¶¶ 58, 66. In so doing, Betson allegedly violated an independent, non-contractual duty.

Importantly, Betson's disparagement began well before the Settlement Agreement was entered in connection with the January 2026 dismissal of the Lawsuit. *See e.g.*, Compl., ¶ 58 (Betson told customers "Betson owns Goldfinger" in early 2024); ¶ 65 (told customers that "Goldfinger was going out of business" after the 2024 Javelin Displays launch). Conduct that predates a contract cannot be intrinsic to it, and because Betson's tortious acts "precede the actual commencement of the agreement," the economic loss doctrine does not apply. *Red Hawk*, 449 F. Supp. 3d at 449, 465. This is completely different from the two inapplicable cases Betson cited which involved interference tied to the parties' own employment contracts. *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 11–1857(DMC)(JAD), 2012 WL 5554543, at *4 (D.N.J. Nov. 14, 2012); *Trico Equipment, Inc. v. Manor*, No. 08–5561 (RBK/KMW), 2011 WL 705703, at *4 (D.N.J. Feb. 22, 2011).

### C. The Complaint States a Claim Under New Jersey's Consumer Fraud Act

"The purpose of the CFA is to 'prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate.'" *Hoffman v. Loiry*, A-2640-14T3, 2016 WL 3693957, at *5 (N.J. App. Div. July 13,

2016) (quoting *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 376–77 (1977)). "In light of the Act's original remedial purpose and its subsequent and continuous expansion by the Legislature, courts have consistently recognized that the CFA must be liberally construed." *All the Way Towing, LLC v. Bucks County Int'l, Inc.*, 236 N.J. 431, 442 (2019). *See Flint Group Packaging Inks N. Am. Corp. v. Fox Indus., Inc.*, No. 16-cv-03009, 2020 WL 6156750, at *7 (D.N.J. Oct. 20, 2020) (referencing the "clear legislative intent that the CFA be applied broadly").

"There is no precise formulation for an 'unconscionable' act that satisfies the statutory standard for an unlawful practice." *D'Agostino v. Maldonado*, 216 N.J. 168, 184 (2013). Rather, the CFA's drafters "expected the Act to be flexible and adaptable enough to combat newly packaged forms of fraud." *Id*. at 186. "Whether the CFA applies depends on the nature of the transaction and whether the goods at issue were 'offered' 'to the public for sale' as stated in N.J.S.A. 56:8-1(c)." *All the Way Towing, LLC*, 236 N.J. at 438. "Thus, neither the commercial setting of a transaction nor a customization of an item removes a transaction from the CFA's reach." *Id*. at 445.

While "entering into a Settlement Agreement" may not be actionable under the CFA (Memo at 10), that is not the basis for Plaintiffs' claim. Nor is Plaintiffs' CFA claim predicated on Betson's breach of the Settlement Agreement. *Id. But cf. Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 586-87 (2011) (held that the CFA prohibits a defendant's unconscionable practices to collect on a loan under a post-foreclosure judgment agreement). Simply put, Count XII is broader than Defendants' inaccurate presentation, and on a Rule 12(b)(6) motion, the Complaint is read as a whole and in Plaintiffs' favor. *Argueta*, 643 F.3d at 74.

In particular, Count XII rests on two independent bases: (1) Betson's infringing, deceptive marketing and sale of competing monitors to the gaming-industry public (Compl., ¶¶

224–228), and (2) the Samples transaction in which Goldfinger gave consideration for, and received, production versions of Javelin Displays monitors that Betson modified to hide its intellectual property violations. *Id.* at ¶¶ 229–232. That is the very type of misleading conduct the CFA was enacted to redress, and Count XII is properly stated for the following reasons.

First, the infringing products sold by Betson and the Samples are "merchandise," which the CFA broadly defines to include "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). Notably, "[t]o fall within the scope of the NJCFA, goods and services need not be only those that are purchased by 'average consumers'; the statute may also cover merchandise that is 'expensive, uncommon, or only suited to the needs of a limited clientele.'" *Flint Group*, 2020 WL 6156750, at *4 (quoting *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103 (KM) (JBC), 2016 WL 1718100, at *6 (D.N.J. Apr. 29, 2016)).

Here, the Complaint alleges that the Samples are Betson's 32" and 43" Javelin Displays monitors, which Betson agreed "are production models reflective of the models that are currently offered in the marketplace." Compl., ¶ 74. Further, the Complaint contains images demonstrating that Betson offers these monitors for sale on the Javelin Displays website. *Id.* at ¶ 75. One significant difference, however, between the Samples and the monitors shown on the website is the color of their back covers. Specifically, it is alleged that Betson modified the Samples, by changing the back covers from a black cover to a blue one, to conceal its infringing activities from Plaintiffs and deceive the public as to the origin of the merchandise. *Id.* at ¶¶ 114-15, 117, 227-30. *See Hoffman*, 2016 WL 3693957, at *6 (the defendant violated the CFA by falsely implying an association with the government). The Samples are therefore properly alleged to be "merchandise" and Betson's deceit fits comfortably within the CFA.

Second, Betson sending Plaintiffs the Samples is a consumer-oriented transaction under the broad reading given to the CFA. The reasoning in *Flint Group* shows how courts liberally apply the CFA to police fraudulent transactions between businesses. That case confirmed that a corporate-plaintiff, which provides consideration in exchange for merchandise, is a "consumer" under the CFA if it "uses (economic) goods, and so diminishes or destroys their utilities." *Flint Group*, 2020 WL 6156750, at *5. That is true when the plaintiff is an "end user" of the merchandise. *Id*. That reasoning should control here because 1) *Flint Group* did not limit the type of use needed to state a CFA claim, and 2) Plaintiffs inspected the Samples to investigate and uncover Betson's intellectual property violations that threaten their customer base and market share. That is a "use" of merchandise affecting its utility, and Defendants' motion to dismiss Count XII should be denied.

Additionally, the court in *Flint Group* sustained a CFA claim that was based partly on misrepresentations made in connection with the defendant's performance of its agreement with the plaintiff and to hide the nature of the merchandise at issue. As here, the defendant in *Flint Group* argued that the statements were not made in connection with the plaintiff's purchase of merchandise. *Id*. at *7. The court rejected that argument and found that the false statements were actionable under the CFA because they were "allegedly made to cover up the nature of" the goods. *Id*. ("the CFA also explicitly covers deceptive practices made 'in connection with … the subsequent performance of' a sale of merchandise").

That is the situation here. The Complaint alleges that Betson sent the modified Samples to cover up their infringing nature (Compl., ¶ 230), and that Defendants provided the false Verification to deceive Plaintiffs regarding Betson's performance under the Settlement Agreement. *Id*. at ¶ 116.

Third, courts have held that a plaintiff has standing to bring a CFA claim against a defendant that is a competitor when the plaintiff acts as a consumer. *See Hart v. Electronic Arts, Inc.*, 740 F. Supp. 2d 658, 669 (D.N.J. 2010) (quoting *Feiler v. New Jersey Dental Ass'n*, 191 N.J. Super. 426, 431 (Ch. Div. 1983) ("A practicing New Jersey dentist has standing to complain that another dentist gains an unfair competitive advantage over him by fraudulent billing practices that enable him to promise and deliver cost savings to patients that are unavailable to patients of an honest practitioner.")).[1]

In this regard, the Complaint alleges how Betson went from Okra's exclusive distributor of Goldfinger products to a direct competitor (Compl., ¶¶ 52-56, 62-65, 224), that Plaintiffs provided consideration to Betson for the Samples (*id.* at ¶ 232), and, by sending the Samples, the parties engaged in a consumer-oriented commercial transaction. *Id.* at ¶ 231. In other words, Plaintiffs gave value to and received goods from Betson, and thus, acted as a consumer of Betson's merchandise. *See Flint Group*, 2020 WL 6156750, at *5 ("Courts in New Jersey 'have squarely held that the NJCFA applies to the sale of merchandise for use in business operations' as here.") (quoting *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 543-44 (D.N.J. 2013)). Thus, Plaintiffs' allegations properly state a CFA claim.

**D. The Complaint States a Claim for Unjust Enrichment**

"The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Goldsmith v. Camden Cnty.*

---

[1] To the extent Defendants invoke the line of cases limiting the CFA to consumers, those decisions are inapposite because they involved a plaintiff suing as a competitor complaining of its own lost sales. *See e.g., Conte Bros. Auto. v. Quaker State-Slick 50, Inc.*, 992 F. Supp. 709, 714 (D.N.J. 1998). Not, as here, a party that gave consideration for and received the defendant's merchandise. Even those cases recognize that the CFA reaches a commercial competitor "who [is] acting as [a] consumer[]" or is "involved in a consumer transaction" (*EP Henry Corp. v. Cambridge Pavers, Inc.*, No. CV 17-1538 (JBS/KMW), 2017 WL 4948064 at *4 (D.N.J. Oct. 31, 2017)), which is exactly what Plaintiffs allege here. Compl., ¶¶ 231–232.

*Surrogate's Office*, 408 N.J. Super. 376, 382 (2009) (quoting *Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 243 (App. Div. 1986)). Plaintiffs' unjust enrichment claim rests on Betson's retention of the profits it earned by infringing Plaintiffs' trademarks and trade dress and trading on Plaintiffs' goodwill. Compl., ¶¶ 245, 247–249.

Plaintiffs seek the disgorgement of Betson's infringement profits under their unjust enrichment claim, and this remedy is independently available through the trademark claims Defendants have not moved to dismiss. Section 35(a) of the Lanham Act authorizes recovery of an infringer's profits "subject to the principles of equity." 15 U.S.C. § 1117(a). Construing that provision, the Third Circuit has held that an accounting of the infringer's profits is available "if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement" – "any one will do" – and "there is no requirement that the defendant's profits approximate the plaintiff's damages." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 177–78 (3d Cir. 2005); *see also Marshak v. Treadwell*, 595 F.3d 478, 495 (3d Cir. 2009) (plaintiff "did not need to establish actual damages" to obtain an accounting of profits where the defendant "w[as] unjustly enriched").

Courts in this District have recognized the same principle in trademark cases. Specifically, "the plaintiff may not have suffered any damages; yet the law still entitles him to recover the defendant's wrongful profits." *American Cyanamid Co. v. Sterling Drug, Inc.*, 649 F. Supp. 784, 789 (D.N.J. 1986) ("American Cyanamid seeks a determination whether Sterling Drug was enriched because of an infringement"). *See Banjo Buddies, Inc.*, 399 F.3d at 178 ("Allowing [the defendant] to keep half the estimated profits of his infringing activities would not serve the Congressional purpose of making infringement unprofitable—[the defendant] would be unjustly enriched and other would-be infringers would be insufficiently deterred.").

Defendants' sole argument is that Plaintiffs did not confer a benefit on Betson. However, Defendants' contention lacks merit because, in the alternative, the Complaint alleges that Okra granted Betson the exclusive right to sell and distribute Goldfinger products worldwide, and that Betson unjustly retained this benefit after the 2018 Agreement was terminated by infringing the Registered Trademarks and improperly trading on Plaintiffs' goodwill to improperly drive sales of its competing products. Compl., at ¶¶ 52, 68, 76-77, 88-89. Dismissing Count XIV would permit Betson to keep the profits it derived from its continued, unauthorized exploitation of Plaintiffs' intellectual property after its distributorship ended. That is contrary to the equitable nature of unjust enrichment and a basis to deny Defendants' motion.

In *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"* 500 F. Supp. 3d 380, 421 (E.D. Pa. 2020), the defendant asserted a counterclaim for unjust enrichment premised on the theory that the plaintiff held onto a trademark after the parties' exclusive licensing agreement ended without any payment to the defendant.[2] The court denied the motion to dismiss the unjust enrichment claim because "retaining valuable marks and trade dress absent payment is the type of conduct that invocation of the doctrine of unjust enrichment can be used to rectify." *Id.* at 422.

Other courts have recognized that an unjust enrichment claim can be tied to the plaintiff's trademark infringement claim. *See e.g., Choice is Yours, Inc. v. Williams*, No. 2:14-cv-01804, 2016 WL 5661709, at *10 (E.D. Pa. Sept. 30, 2016) ("Whether [the plaintiff] can exercise this claim thus depends upon the success of his underlying claims for misappropriation and trademark infringement."); *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12 Civ. 7992,

---

[2] Although the unjust enrichment claim in *I.M. Wilson, Inc.* was brought under Pennsylvania law, the elements are similar to a claim under New Jersey law. 500 F. Supp. 3d at 421 ("Unjust enrichment under Pennsylvania law requires pleading that plaintiff . . . conferred a benefit on the defendant; the defendant appreciated that benefit; and that it would be inequitable for defendant to accept and retain the benefit without paying for the value of the benefit.").

2014 WL 185222, at *13 (S.D.N.Y. Jan. 16, 2014) ("Here, plaintiff's unjust enrichment claim is founded on defendants' alleged infringement of its marks. Because those claims survive summary judgment, plaintiffs' unjust enrichment claim must also survive summary judgment.").

That is the precise situation here. The unjust enrichment claim alleged in the Complaint is predicated on Betson's infringement of Plaintiffs' trademarks and trade dress, which has allowed Betson to improperly profit. Compl., ¶¶ 245, 247-49. Plaintiffs seek restitution and the disgorgement of Betson's ill-gained profits. *Id.* at pp. 61-62, § H(6). *See* Restatement (Third) of Restitution and Unjust Enrichment § 42 (Am. Law. Inst. 2011) ("A person who obtains a benefit by misappropriation or infringement of another's legally protected rights in any idea, expression, image, or designation is liable in restitution to the holder of such rights."). Accordingly, the Court should deny Defendants' motion to dismiss Count XIV.

**E. The Fraud Claim Against Defendants Is Not Barred by the Economic Loss Doctrine, and Zayas-Bazan Can Be Found Liable Under the Participation Theory**

1. <u>The Economic Loss Doctrine Does Not Apply to the Fraud Claims Against Defendants</u>

"Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002). A plaintiff's intellectual property rights are extrinsic to a contract "and therefore can provide the basis for a tort cause of action despite a parallel claim for breach of contract" (*CLI Interactive, LLC*, 2023 WL 1818381, at *8), and "every person has a 'duty' to refrain from committing intentional torts." *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 588 (D.N.J. 2014) (citing *Blystra v. Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 647 (D.N.J. 2005)). Betson's duty not to infringe Plaintiffs' trademarks is an independent, legally imposed duty separate from the Settlement Agreement.

Defendants mistakenly assert that "none of the allegations" in Count XV "allege conduct extraneous to the Settlement Agreement." Memo at 12. To the contrary, the Complaint details how Betson infringed Plaintiffs' intellectual property rights (*see* Compl., Counts II, IV and V), and Count XV alleges that (1) Betson modified the Samples, and (2) Zayas-Bazan provided the false Verification to "hide Betson's infringing activities" from Plaintiffs. *See* Compl., ¶¶ 112-16, 240, 258-60. Betson's infringing acts, and Defendants' concealment of them, are not intrinsic to the Settlement Agreement, but violations of independent duties tied to Plaintiffs' statutory intellectual property rights. *See Absorption Pharms., LLC v. Reckitt Benckiser LLC*, No. 17-12872, 2020 WL 10139487, at *6 (D.N.J. June 25, 2020) ("An independent duty separate from contract may arise where a statute authorizes a private right of action for tortious conduct.").

As to Zayas-Bazan specifically, he is not protected by the economic loss doctrine because it "only applies to bar certain tort claims *between parties to a contract*." *SRC Constr. Corp. of Monroe v. Atlantic City Housing Auth.*, 935 F. Supp. 2d 796, 799 (D.N.J. 2013) (emphasis in original); *State Cap. Title & Abstract Co.*, 646 F. Supp. 2d at 676-77. Zayas-Bazan is not alleged to have a contract with Plaintiffs. Thus, the economic loss doctrine does not bar Plaintiffs' fraud claims against him for this reason.

Defendants cite *Chen v. Wang*, No. 22-4708 (MAS) (JBD), 2024 WL 4771305 (D.N.J. Nov. 12, 2024), to argue that Zayas-Bazan need not be in privity of contract for the economic loss doctrine to apply, but that case does not help them. First, *Chen* dismissed the fraud claim because it was not pleaded with the particularity required by Fed. R. Civ. P. 9(b). *Id.* at *16. Second, the court applied the economic loss doctrine to dismiss a negligent misrepresentation

claim because the plaintiff did not allege "a duty of care arising from an independent source" or "an independent duty imposed by law." *Id.* at **16-17.[3]

Also, the economic loss doctrine does not shield Zayas-Bazan because his fraudulent concealment of Betson's infringement breaches a duty extrinsic to the Settlement Agreement. *See CLI Interactive, LLC*, 2023 WL 1818381, at *8 ("But if a contract provides, for example, that the parties will not steal from one another, the doctrine will not apply in the case of theft, since the victim would enjoy the right not to be stolen from event absent the contractual provision.").

2. Zayas-Bazan May Be Liable Due to His Participation in the Fraud

The "New Jersey cases that have applied the participation theory to hold corporate officers personally responsible for their tortious conduct generally have involved intentional torts. More specifically, the majority of the cases have involved fraud and conversion." *Saltiel v. GSI Consultants, Inc.*, 170 N.J. at 304. A key difference between *Saltiel* and the claim against Zayas-Bazan is that "the tortious conduct alleged here is intentional fraud, whereas the tort alleged in *Saltiel* was negligence." *G & F Graphic Servs.*, 18 F. Supp. 3d at 588. That is an independent basis to deny the motion.

In *G & F Graphic Servs.*, the court denied a motion to dismiss a fraud claim asserted against the corporation-defendant's President, arising from his representations about the model of a product purchased by the plaintiff. *Id.* at 585. The court rejected the individual-defendant's argument that he could not be liable in tort under a participation theory. In reaching this result, the court expressly acknowledged that "every person has a 'duty' to refrain from committing

[3] Defendants also cite *MJF Elec. Cont., Inc. v. Toms River Bd. of Ed.*, No. 20-7336, 2021 WL 1168962 (D.N.J. Mar. 26, 2021), but that case is distinguishable because the court dismissed a negligent misrepresentation claim – not an intentional tort – under the economic loss doctrine.

intentional torts." *Id.* at 588 (citing *Blystra v. Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 647 (D.N.J. 2005)).

Under *G & F Graphic Servs.*, an officer who makes a misrepresentation may be found liable because he participated in the fraud. Thus, when the plaintiff alleges that the officer made a material misrepresentation, the officer cannot be shielded. That is the situation here, and Defendants' reliance on *Saltiel* is misplaced because that case involved a negligence claim with no independent duty, unlike the fraud claim against Zayas-Bazan. Thus, the Court should follow *G & F Graphic Servs.* and deny the motion to dismiss the fraud claim against Zayas-Bazan.

**F. The Complaint States a Claim for Unfair Competition Against Zayas-Bazan**

Defendants' recitation of what constitutes unfair competition under New Jersey is materially incomplete. The tort is not limited to the misappropriation of one's property by another. To the contrary, "New Jersey's 'law of unfair competition is an amorphous area of jurisprudence. It knows of no clear boundaries…. The concept is as flexible and elastic as the evolving standards of commercial morality demand.'" *Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592, 600 (D.N.J. 2000) (quoting *New Jersey Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.,* 144 N.J. Super. 411, 427 (Ch. Div. 1976)). When unfair competition involves misappropriating another property, such misconduct "usually takes the form of 'palming off' another's goods as your own, although the modus operandi is not essential." *Id.* at 600-01 (citation omitted).

Importantly, "unfair competition at common law is a species of deceit, especially through 'the simulation by one person of the name, symbols or devices employed by a business rival, so as to induce the purchase of his goods under a false impression as to their origin or ownership and thus secure for himself benefits properly belonging to his competitor.'" *Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F. Supp. 693, 708 (D.N.J. 1977) (quoting 74 Am.Jur.2d,

*Trademarks and Tradenames*, s 87 (rev. ed. 1974)). "It is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods under all the circumstances." *Fotomat Corp.*, 425 F. Supp. at 708-09.

Thus, based on New Jersey's expansive view of unfair competition, Plaintiffs need not allege that "defendant Zayas-Bazan misappropriated plaintiffs' property" to state a claim, as Defendants erroneously contend. Memo at 13.[4] The Complaint alleges deceptive conduct by Zayas-Bazan that fits squarely within what courts consider unfair competition. In particular, the Complaint alleges that Zayas-Bazan provided false information to Plaintiffs to conceal Betson's trade dress infringement. Compl., ¶ 240. Zayas-Bazan's alleged conduct was designed to mislead Plaintiffs and would result in consumers being deceived as to the origin of Goldfinger and Javelin Displays monitors. Stated differently, Zayas-Bazan allegedly aided and attempted to hide Betson's infringement by providing Plaintiffs with false information about the design and appearance of Betson's competing monitors. This kind of dishonest dealing is exactly what the tort of unfair competition is designed to redress. *See Duffy*, 97 F. Supp. 2d at 601 ("Some acts that constitute unfair competition have been described as follows: either that the means used are dishonest, or that, by imitation of name or device, there is a tendency to create a confusion in the trade, and enable the seller to pass off upon the unwary his goods as those of another, and thereby deceive the purchaser") (quoting *Squeezit Corp. v. Plastic Dispensers,* 31 N.J. Super.

---

[4] Defendants' motion requests dismissal of Count XIII only as to Zayas-Bazan. Therefore, Plaintiffs' unfair competition against Betson survives irrespective of how the motion is decided.

217, 221-22 (App. Div. 1954)). The Court should therefore deny the motion to dismiss Plaintiffs' unfair competition claim.

Moreover, the economic loss doctrine does not apply because, as noted above, "tort claims are barred where entitlement thereto 'flows *only* from a contract.'" *CLI Interactive, LLC*, 2023 WL 1818381, at *8. The Complaint does not allege there was a contract between Plaintiffs and Zayas-Bazan, and this "precludes the application of the economic loss doctrine." *SRC Constr. Corp.*, 935 F. Supp. 2d at 799. Even in the typical economic loss doctrine case, "the reason for foreclosing a tort claim is not simply because a contract claim exists, but rather, that the tort claim is not really a tort claim at all; it is a contract claim in tort claim clothing." *Id.* at 801. And, "where there is no direct contractual relationship between the plaintiff and defendant, frequently there can be no contract claim at all, and therefore any tort claim asserted cannot possibly be a contract claim in tort clothing." *Id.*

In addition to the fact that no contract is alleged between Plaintiffs and Zayas-Bazan, the conduct he is accused of is not a contract claim in tort claim clothing. Specifically, the Complaint alleges that Zayas-Bazan gave Plaintiffs false information to conceal Betson's intellectual property infringement. Such an allegation undeniably describes tortious conduct.

### G. Plaintiffs Should Be Granted Leave to Replead Any Claim That is Dismissed

Defendants overreach by requesting dismissal with prejudice. A court "should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice, or futility" – none of which are applicable here. *Bellocchio v. New Jersey Dept. of Environmental Protection,* 16 F. Supp. 3d 367, 374 (D.N.J. 2014). Even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, "a District Court must permit a curative amendment, unless the amendment would be inequitable or futile." *Alston v. Parker,* 363 F. 3d 229, 235 (3d Cir. 2004). Dismissal

with prejudice is a "severe and disfavored remedy," and nothing here justifies Defendants' draconian request. *Alvin v. Suzuki*, 227 F.3d 107, 122 (3d Cir. 2000) (citations omitted). Plaintiffs respectfully submit that Defendants' motion should be denied in its entirety. If, however, the Court finds any deficiency in the Complaint, Plaintiffs respectfully seek leave to amend and cure the defect. *See* Fed. R. Civ. P. 15(a)(2) (directing courts to "freely give leave [to amend] when justice so requires"). Therefore, the Court should not dismiss any claim with prejudice.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion to dismiss in its entirety. However, for any claim dismissed, Plaintiffs respectfully request dismissal without prejudice and with leave to amend and replead.

Respectfully submitted,

Dated: November 25, 2026

By: s/ Alexander L. Callo
William C. Baton
Alexander L. Callo
**SAUL EWING LLP**
650 College Road East, Suite 4000
Princeton, NJ 08540
wbaton@saul.com
alexander.callo@saul.com

Matthew D. Kohel (admitted *pro hac vice)*
**SAUL EWING LLP**
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
matthew.kohel@saul.com

*Attorneys for Plaintiffs*
*Okra Holdings, Inc. and Goldfinger, Inc.*